[No. B051688. Second Dist., Div. Two. Nov. 5, 1991.]

LAS PALMAS ASSOCIATES et al., Plaintiffs, Cross-defendants and Appellants, v.
LAS PALMAS CENTER ASSOCIATES et al., Defendants, Cross-complainants and Respondents.

1222

1226

COUNSEL

Kaye, Scholer, Fierman, Hays & Handler, Pierce O'Donnell, Roger Furman, Hoon Chun, Irell & Manella, Steven L. Sloca, William M. Hensley and Patricia A. Hubbard for Plaintiffs, Cross-defendants and Appellants.

Terry M. Giles, Alton G. Burkhalter and Sean A. Davitt for Defendants, Cross-complainants and Respondents.

OPINION

NOTT, J.—This lengthy and acrimonious litigation involves the sale of the Rancho Las Palmas Shopping Center, a 165,472-square-foot commercial complex located in Rancho Mirage, California. Appellants Las Palmas Associates et al., built and sold the property to respondents Las Palmas Center Associates et al. When a dispute arose concerning their duty to guaranty the rents of two tenants, appellants commenced an action for declaratory relief. Respondents in turn filed a cross-complaint for, among other things, fraud and breach of contract. A jury rendered verdicts awarding respondents $232,393 for breach of contract, $1.27 million for fraud, and $10 million in punitive damages. In a separate trial, the court, sitting without a jury, denied appellants declaratory relief. The court then awarded respondents $352,918 in contractual attorney's fees and entered judgment in the sum of $11,622,918. Appellants now appeal.

Because the undisputed evidence establishes that respondents' fraud damages are identical to their losses under the breach of contract theory, we hold that the fraud award must be reduced to $232,393. Additionally, we find it necessary to lower the punitive damage award to $2 million. Lastly, inasmuch as respondents have elected to take under the tort claim, the award for

contractual attorney's fees allocated to prosecute that action must be reversed. However, because respondents were the prevailing parties in appellants' declaratory relief lawsuit, which was an "action on the contract," respondents are entitled to recover their attorney's fees incurred in defense of that litigation.

## CONTENTS

Appellants seek a reversal of the judgment on the basis that (1) the trial court erroneously denied their motion to bifurcate the punitive damage trial from respondents' underlying action for fraud, in violation of Civil Code section 3295, subdivision (d); (2) there are no grounds to hold Hahn Devcorp as the alter ego of its sister corporation, Ernest Hahn, Inc.; (3) the fraud verdict is unsupported by substantial evidence and is invalid as a matter of law; (4) respondents' trial counsel committed prejudicial misconduct; (5) the $1.27 million fraud award, among other things, improperly compensates buyers for a claim that they previously relinquished; and, (6) the punitive damage verdict is unsupported by the evidence, excessive, unconstitutional, and the product of the jury's passion and prejudice. Appellants do not, however, complain that the breach of contract award is defective.

## INTRODUCTION

In 1978, Las Palmas Associates (Associates), a limited partnership, agreed to build and then sell the Rancho Las Palmas Shopping Center (shopping center) to Villa Pacific Building Company (Villa Pacific), a corporation. Villa Pacific's sole shareholder and board chairman was Ronald Waranch, a real estate developer. Under the terms of the purchase agreement, Villa Pacific acquired an 84 percent interest in the yet to be constructed shopping center. The remaining 16 percent share belonged to Stanley Gribble, president of Hahn Devcorp (Devcorp), a builder of community and neighborhood shopping centers. Gribble received his interest in the shopping center as part of his executive compensation package from Devcorp. Besides being Associates' general partner, Devcorp was also at the time a wholly owned corporate subsidiary of Ernest W. Hahn, Inc. (Hahn Inc.), a nationwide developer of regional shopping centers. Together, Gribble and Villa Pacific formed a general partnership known as Las Palmas Center Associates (Las Palmas), which would eventually hold title to the property.

For the sake of clarity, we will refer to Associates, Devcorp and Hahn Inc. collectively as "sellers." Similarly, we will identify Villa Pacific, Waranch, and Las Palmas jointly as "buyers."

## Facts

Viewing the evidence, as we must, in the light most favorable to the prevailing party (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 570 [136 Cal.Rptr. 751]; *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 462 [136 Cal.Rptr. 653]), the record reveals that the initial price for the shopping center was $10,727,499. That amount, though, was subject to being either increased or decreased, depending on the project's completion date and the rental income generated from the leases of commercial tenants. Buyers paid up-front $2 million in cash to sellers. To protect that investment, Hahn Inc. in 1978 issued two guaranties to assure buyers the cash payment would be refunded if the deal collapsed.

In conjunction with the sale, buyers leased back the property to sellers. The parties also entered into various other amended purchase agreements, the effect of which was to require sellers to secure construction and permanent financing, build the complex, and sublease the property to tenants meeting certain financial and operating specifications. As consideration for the lease, sellers promised to pay buyers a portion of the gross rentals beginning in March 1980. The parties, moreover, had title to the property placed into an escrow account scheduled to close upon the completion of the shopping center and the subleasing of the stores to tenants. At the end of escrow, the parties planned for buyers to assume the permanent financing and pay sellers another cash payment. They also agreed that after the transaction closed, sellers would manage the facility for a period of three years.

One component of the purchase price was the capitalization of the shopping center's rental income.[1]

To establish the final purchase price, Waranch testified at trial that the parties selected a 7 percent capitalization rate. They then divided that percentage into the net operating income of the shopping center as of the date of closing. The parties defined net operating income as the actual rental income less operating expenses and debt service. The result of that operation was then multiplied by 84 percent, which represented buyers' interest in the property.

---

[1] Capitalization is a method of establishing a present day price for an asset that produces future income, such as rental property. It has been defined as "The amount equal to the value of the sum of money that would earn a periodic interest return equal to the rent if invested at the current market rate of interest." (Dolan, Basic Economics (2d ed. 1980) ch. 32, Rent, Interest, and Profits, p. 554.)

In 1980, a dispute arose between the parties concerning the amount of rental income sellers had collected. Buyers contended they were entitled to approximately $1.6 million in rents. In contrast, sellers asserted there was no rental income because operating expenses exceeded rents by $400,000. As a compromise, buyers relinquished their claim for the rents in exchange for sellers taking $2,187,683 of the purchase price in the form of buyers' promissory note. The note had a rate of 7 percent interest and was secured by a deed of trust to the shopping center.

Sometime in either 1980 or 1981, Hahn Inc. merged with Trizec Centers, Inc., a subsidiary of Trizec Corporation Ltd. At trial, the court admitted into evidence the proxy statement of that transaction. According to the document, Ernest Hahn, the board chairman and chief executive officer of Hahn Inc., agreed to sell his 1.6 million shares of the company to Trizec Centers. The proxy statement further revealed that on May 19, 1980, Ernest Hahn executed an employment agreement to serve as chief executive officer for Hahn Inc. and Trizec Centers. Under the employment agreement, the board of directors of Hahn Inc. and Devcorp would consist of two persons appointed by Ernest Hahn and five directors named by Trizec Centers. It was also anticipated that Ernest Hahn would appoint himself and Robert W. Lees, the former president of Hahn Inc., to both boards.

Furthermore, the proxy statement revealed that in 1980 Devcorp had 25 shopping centers either under development or in operation. The document stated Devcorp owed over $30 million in outstanding loans, had secured $43.2 million in loan commitments, and that Hahn Inc. had fully guarantied the financing.

On March 20, 1981, Hahn Inc. transferred all 10,000 of its shares of Devcorp to Trizec Centers. Three days later, Trizec Centers conveyed 659 shares of Devcorp to Goldlist Acquisition Corp. and the remaining 9,341 shares of Devcorp to Trizec Equities, Inc.

By early 1982, the shopping center had two problem tenants. Franchise Stores Realty Corp. (Franchise) held a 10-year lease that it assigned to one Robert Young. He, however, eventually abandoned the store, leaving the leasehold to revert back to Franchise with $6,000 owed in back rent. At the same time, Phanny's Phudge Pharlors (Phanny's Phudge), which had signed a 15-year lease, was out of business and attempting to sublet its store.

As the closing date approached, buyers objected to including Phanny's Phudge and Franchise into the capitalized purchase price. To persuade buyers to consummate the transaction, sellers had Devcorp guaranty the

stores' two leases. Pursuant to the guaranties, Devcorp essentially pledged to pay all sums due under the leases until Phanny's Phudge and Franchise paid their rents for consecutive periods ranging from three to six months. The guaranties also obligated buyers not to unreasonably withhold their permission to assignments of the leases.[2]

With the rents capitalized, the total face value of the cash and financing paid by buyers was $15,046,800. Of that amount, $639,898 represented the capitalized rents from the Franchise and Phanny's Phudge leases.

Following the execution of the guaranties, Franchise sought to assign its lease to Riverco. Buyers rejected the assignment until sellers orally agreed that Riverco was covered by the Devcorp guaranty. After Riverco assumed the lease, it never once kept its rent payments current for the number of consecutive months required by the lease guaranty. Then, in December 1983, Riverco declared bankruptcy.

Meanwhile, Phanny's Phudge also had closed its doors and was attempting to locate a subtenant. In May 1982, buyers asked Devcorp to honor its commitment under the Phanny's Phudge guaranty. Devcorp refused the request, contending it had no obligation to pay the rent because buyers had unreasonably denied an assignment of the property to another tenant. Subsequently, in a July 1982 correspondence, Devcorp's corporate counsel, Vaughn Hapeman, disavowed the guaranty, claiming Phanny's Phudge had kept its rent current for the requisite three consecutive months ending that

---

[2]Specifically, the lease guaranties provided:

(1) "Seller unconditionally guarant[ees] to Buyer the full and uninterrupted payment by Phanny's Phudge Pharlors ('Phanny's Phudge') of all amounts payable pursuant to its lease dated November 13, 1979, as amended July 1, 1981 (the 'Phanny's Phudge Lease'), of space within the Shopping Center (i) until such time as Phanny's Phudge shall not be delinquent in the payment of such amounts, or in the performance of their obligations under the Phanny's Phudge Lease to operate their business, for a period of any three (3) successive months from and after the date of this Sixth Amendment, or (ii) until the written approval by Buyer of any further assignment, subletting or termination of the Phanny's Phudge Lease, which approval shall not be unreasonably withheld, whichever first occurs, and Seller shall thereupon be automatically released from its obligations under this Paragraph 4."

(2) "Seller unconditionally guarant[ees] to Buyer the full and uninterrupted payment by Franchise Stores Realty Corp. ('Franchise Stores') of all amounts payable pursuant to its lease ('Franchise Stores Lease') of space in the Shopping Center (i) until Franchise Stores shall not be delinquent in the payment of such amounts for a period of any six (6) successive months from and after the date of this Sixth Amendment, or (ii) until Franchise Stores takes back possession and operates the premises covered by the Franchise Stores Lease for a period of any three (3) successive months, or (iii) until written approval by Buyer of any further assignment, subletting or termination of the Franchise Stores Lease, which approval shall not be unreasonably withheld, whichever first occurs, and Seller shall thereupon be automatically released from its obligations under this Paragraph 5."

June. Buyers would later present evidence at trial that Hapeman made the assertion, despite the fact: (1) sellers' own management company served three-day notices to Phanny's Phudge demanding payment of the rents for May and June 1982; and, (2) that Stanley Gribble, Devcorp's president, wrote margin notes to Hapeman on an internal copy of the letter stating he thought Phanny's Phudge rent was past due for the period in question.

By June 1983, Devcorp's board of directors was liquidating the company's assets and discharging its executives and employees. Eventually, Devcorp became a shell company with Hahn Inc.'s staff transacting its remaining business.

Also that year, at the suggestion of Devcorp's attorney, buyers evicted Phanny's Phudge from the property and obtained a $34,814 unlawful detainer judgment. On November 8, 1983, buyers assigned the judgment to sellers because, as discussed in more detail below, buyers had been offsetting from their loan payments the rents left unpaid by Phanny's Phudge and Franchise.

In the summer of 1984, buyers notified sellers that they had located a tenant who desired to open a Greek restaurant in the Phanny's Phudge store. On July 23, 1984, Randy Brant, the director of leasing operations for Hahn, Inc., wrote to buyers' property manager, stating: "Please proceed to finalize the [deal for the Greek restaurant]. As the proposed rent will not reach our guarant[ied] rent until the third year Ernest W. Hahn, Inc. will agree to pick up the difference. . . . In addition Ernest W. Hahn, Inc. will agree to guarant[ee] this lease and pay the commission amount of $7,235.00 to Weiman Property Management. . . ." Relying on the offer, buyers entered into the lease with the new tenant.

On September 27, 1984, Jana Green, corporate counsel for Hahn Inc., wrote buyers' management company using Devcorp's stationery. The letter rescinded the Hahn Inc. guaranty and replaced it with one issued by Devcorp. The letter stated: "This letter supersedes that certain letter, dated July 24, 1984, from Mr. Randy Brant, Director of Leasing, rendering it void and of no force and effect. [¶] The purpose of this letter is to provide a new guarant[y] on the same terms and conditions of the 'Phanny['s] Phudge' lease guarant[y] which said terms and conditions are as set forth below. . . ." Green signed the letter as corporate counsel for Devcorp.

A week later, Devcorp again changed its position and had Green write buyers that it was no longer responsible for any of the guaranties. First, she asserted buyers' eviction action had terminated the Phanny's Phudge guar-

anty. Her letter also announced that sellers were giving buyers a $34,814 credit against the promissory note, apparently in recognition of the tender of the unlawful detainer judgment. Secondly, the attorney insisted the lease assignments to Young, and then later to Riverco, had relieved sellers from their obligations under the Franchise guaranty.

As previously discussed, buyers were offsetting the uncollected rents from their loan payments. They started to take the deductions in August 1982 and continued the practice without objection from sellers until May 1984. At that time, sellers asked buyers to stop the deductions and instead bill them for the uncollected rents. Buyers complied with the request, but never received any remittances from sellers. Eventually, buyers reinstituted the offsets.

As events developed, it would not be until March 1986 before buyers located a tenant for the Franchise store who paid a sufficient number of consecutive rents to terminate that lease guaranty. Similarly, a tenant who paid the requisite number of consecutive rents for the Phanny's Phudge store was not found until October 1986.

Sellers commenced the present action in Riverside County. Their complaint sought a declaration that the lease guaranties had terminated and that buyers had defaulted on the promissory note by taking the offsets. After buyers succeeded in having venue for the lawsuit transferred to Los Angeles County, sellers initiated a nonjudicial foreclosure to collect the arrearages caused by the offsets. To cure the default, Buyers paid sellers $322,288, which included the offsets, plus interest. Buyers then filed a cross-complaint seeking, among other things, damages for breach of the lease guaranties. They also sought punitive damages for fraud, tortious breach of contract, and intentional infliction of emotional distress. In their fraud action, buyers alleged that sellers had misrepresented their intent to honor the guaranties in order to induce buyers into consummating the sale.

At the conclusion of extensive pretrial proceedings, the court dismissed all the tort claims except for the fraud action. The court also decided to impanel a jury to hear both lawsuits and to return advisory verdicts on the equitable issues. The court further ruled on sellers' *in limine* motion to exclude buyers from introducing evidence on various matters. However, despite the fact that buyers were seeking punitive damages for fraud, sellers neglected to request a protective order to preclude buyers from introducing evidence of sellers' financial condition.

In opening statements to the jury, both sides announced that buyers were seeking punitive damages. In addition, buyers on two separate occasions

during their opening statement informed the jury, without a challenge by sellers, that Hahn Inc. was a "billion-dollar company."

Sellers prosecuted their lawsuit first and called as a witness Vaughn Hapeman, general counsel for Devcorp. Under cross-examination by buyers, Hapeman acknowledged that Hahn Inc. was a billion dollar company.[3]

To determine the shopping center's market value, sellers called as their expert witness Thomas Marshall, a member of the Appraisal Institute. He testified that in February 1982, he conducted an income, cost, and sales comparison analysis of the property. Having assumed a 6 percent vacancy rate, Marshall opined that under the income approach the shopping center's market value in 1982 was $16.4 million, or $13,776,000 for buyers' 84 percent interest. He further stated its present worth was $22.9 million.

On cross-examination, buyers questioned Marshall concerning his written appraisal report that claimed buyers actually had underpaid for the shopping center. Marshall arrived at that conclusion by reducing the face value of buyers' promissory note ($2,187,683) to $600,000. Because of favorable terms, Marshall opined that the note needed to be discounted by approximately $1.5 million to determine its present day value in 1982. Using the discounted value of the note, Marshall calculated that the consideration given by buyers was only $13,546,800. By subtracting that amount from the $13,776,000 appraised value of buyers' share of the shopping center, Marshall was able to demonstrate that buyers made an immediate $229,200 profit from the transaction. Marshall admitted, however, that in arriving at his opinion he did not include the fact that buyers had relinquished their claim for $1.6 million in back rents as consideration for the right to finance the final purchase price payment.

Sellers concluded their case on the sixth day of trial. The following morning, buyers brought a motion to have sellers make available their financial records. Buyers argued that the motion should be granted because through cross-examination of sellers' witnesses they had presented a prima facie case for punitive damages. Buyers further informed the court that their first witness was Vernon Schwartz, the former senior vice-president and chief financial officer of Hahn Inc., who had traveled from San Francisco to be in court.

Sellers opposed the discovery motion, contending buyers had failed to meet their statutory burden to establish by clear and convincing evidence

---

[3]At oral argument before us, sellers' counsel represented that his clients had objected to the questions directed at their wealth. Actually, the record reflects that sellers objected to buyers' inquiry concerning the merger with Trizec Centers, Inc.

that sellers were guilty of acts justifying exemplary damages. During argument on this point, the trial court inquired: "I take it you did not ask for bifurcation [of the issue of the sellers' wealth under Civil Code section 3295, subdivision (d)]?"[4] Sellers answered in the negative because they believed there was insufficient evidence of fraud to warrant disclosure of their wealth.

The trial court ordered sellers to provide the financial records. Sellers then made an oral motion to exclude evidence of their finances from the jury under subdivision (d) of section 3295. The trial court denied the request.

Thereafter, during buyers' direct examination of Schwartz, the witness estimated that Hahn Inc. owned more than 40 shopping centers and had assets in excess of a billion dollars.

The remainder of the trial lasted for nearly three weeks. During their case-in-chief, buyers attempted to prove the economic downturn of the early 1980's, along with unanticipated construction costs and higher interest rates, caused sellers to overestimate their profit margin. Under buyers' scenario, sellers needed the rents from Franchise and Phanny's Phudge to be capitalized into the final purchase price to keep the deal profitable. Buyers also sought to prove that after the issuance of the guaranties, sellers drained Devcorp of its assets and manpower for the purpose of leaving the company a mere shell corporation.

Before submitting the case to the jury, the parties stipulated the net value of Hahn Inc. was $497 million. They also agreed Devcorp had a total worth of $4.1 million.[5]

In closing summation to the jury, buyers argued that sellers owed them $232,292 for breach of the guaranty agreements. The amount represented uncollected rents, management fees, taxes, penalties, interest, and other miscellaneous costs due under the Franchise and Phanny's Phudge leases. Turning to the tort action, they asked the jury to find that sellers had fraudulently promised to guaranty the leases as an inducement for them to complete the deal. In addressing the issue of fraud damages, buyers' counsel first told the panel: "I could ask you for a million, two-seventy

---

[4]All further statutory references are to the Civil Code unless otherwise indicated. As explained later in our opinion, section 3295, subdivision (d) grants a defendant the option of requesting the trial court to exclude from the trier of fact evidence of the defendant's wealth until a verdict is rendered for plaintiff awarding actual damages and a finding has been made that defendant was guilty of malice, oppression, or fraud.

[5]Apparently, half of Devcorp's net worth came from buyers' promissory note.

. . . .[6] We're not going to do that because I think that is a—I think ridiculous, even though it works to our advantage at this point. I think it's a ridiculous theory. I don't think it's justified and I don't think it's right." He then urged the jury to find that the proper measure of the fraud damages was the capitalized cost of the two leases: $639,878 ($374,702 for Phanny's Phudge and $265,176 for Franchise).

On the other hand, sellers asserted in their closing argument that buyers had not suffered any fraud damages because the shopping center in 1982 was worth more than what buyers had paid. Then referring to the property's current value, sellers' attorney stated: "Of course, we also know that when we talk about market value, you heard the testimony of the appraiser, the market value conservatively appraised is $22.9 million. Far more than what [buyers] paid."

Seizing on sellers' closing argument, buyers' attorney on rebuttal told the jury: "I'm going to change my mind from yesterday. [Sellers' attorney] stands up here and he says that the real measure of damages on the shopping center is that [buyers get what they] paid for, and he says . . . today that the center was worth [$]22,900,000. You heard the appraiser. The appraiser said it was worth sixteen million four and 84 percent of it was that number. And that is what [buyers] paid, and that is what [they] overpaid. That theory is the dumbest theory in the world to base damages on. And the real theory, the second one that's easily had, and that is the one I told you about on the [$]639,000. You know, if he wants to be dumb enough to stand up and continue to argue that is the way to do it, then bury him with it, okay? On that verdict form when you put down how much is the guilt of fraud, don't put the [$]639,000, follow his instruction and put [$]1,270,000 down there. That is what he wants you to do."

After deliberating for only one day, the panel unanimously agreed sellers had breached the two guaranties. The jury set damages at $232,393. By a vote of 10 to 2, the jury also found (1) sellers had fraudulently misrepresented their intent to honor the guaranties, causing buyers to overpay $1.27 million for the shopping center; and (2) in making the guaranties, sellers acted with oppression, fraud, or malice. Voting 9 to 3, the panel assessed sellers $10 million in punitive damages. Finally, the jury also unanimously found that Devcorp was the alter ego of Hahn Inc. and that Hahn Inc. should be held liable for the obligations of Devcorp.

---

[6]Buyers arrived at that figure by subtracting the appraised value of their share of the shopping center ($13,776,000) from the face value of the consideration they paid ($15,046,800).

The court thereafter dismissed the jury and allowed the parties to address the merits of sellers' declaratory relief action. The parties also argued whether Hahn Inc. should be held accountable for Devcorp's conduct. Following argument, the trial court determined that sellers had breached the guaranties. It further held there was a sufficient unity of interest and ownership between the two corporations to find Devcorp to be the alter ego of Hahn Inc.

Sellers made various posttrial motions. In their request for a new trial, they contended, inter alia, that an award of $1.27 million in fraud damages was unsupported by the evidence and that the punitive damage verdict was excessive. The trial court took the motions under submission, remarking ". . . I have never seen a simple commercial real estate sale transaction screwed up so badly by so many members of the bar over a long period of time as I have in this situation. [¶] It is absolutely unbelievable what has happened to these parties over this period of time." Two days later, the trial court summarily denied the motions.

## DISCUSSION

### I. *Whether the Fraud Verdict Should Be Affirmed*

 Sellers assert the evidence is insufficient to support a finding that at the time they initially entered into the lease guaranties they harbored an intent to defraud buyers. We conclude otherwise.

We are aware of the danger of grafting tort liability on what ordinarily should be a breach of contract action. While society has a strong interest in the security of transactions, parties dealing at arm's length are permitted to reach a reasoned decision to breach an agreement, knowing their risk is limited to the reimbursement of the other side's compensatory losses. However, no public policy is served by permitting a party who never intended to fulfill his obligations to fraudulently induce another to enter into an agreement. In recognition of this principle, section 1710, subdivision (4) defines fraud as the making of a promise done without any intention of performing the obligation. "'A promise to do something necessarily implies the *intention to perform*, and, where such an intention is absent, there is an implied misrepresentation of fact, which is actionable fraud. [Citations.]' [Citations.]" (*Joanaco Projects, Inc.* v. *Nixon & Tierney Constr. Co.* (1967) 248 Cal.App.2d 821, 831 [57 Cal.Rptr. 48], italics in original.)

Recognizing the adverse effect fraud has on commercial transactions, the law permits a defrauded party to seek punishment of the wrongdoer through

the imposition of punitive damages. ■ "Although punitive damages may not ordinarily be given for breach of contract, whether the breach be intentional, willful or in bad faith [citations], such damages may be awarded where a defendant fraudulently induces the plaintiff to enter into a contract. [Citations.] The words 'oppression, fraud, or malice' in Civil Code section 3294 being in the disjunctive, fraud alone is an adequate basis for awarding punitive damages. [Citations.]" (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 135 [135 Cal.Rptr. 802], fn. omitted.)

■ In proving fraud, however, rarely does a plaintiff have direct evidence of a defendant's fraudulent intent. Therefore, the subsequent conduct of a defendant, such as his failure to immediately carry out his pledge has some evidentiary value to show that a defendant made the promise without the intent to keep the obligation. But, " 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.' [Citations.]" (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212].)

■ As in all substantial evidence challenges, the appellate court's power of review commences and ceases with the location of any substantial evidence, contradicted or uncontradicted, which will support the determination. (*Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].) The appellate court cannot limit its review of the record to the evidence cited by the respondent; it must consider the entire record in determining whether the judgment is supported by sufficient evidence. (*Bowers* v. *Bernards, supra,* at p. 873.) Evidence is substantial if it is "reasonable in nature, credible, and of solid value." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) Moreover, the testimony of a single witness is sufficient to satisfy the test of the substantial evidence rule. (*Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052 [236 Cal.Rptr. 526].)

■ Applying this framework of principles to the present case, the record contains credible evidence from which a trier of fact could conclude sellers committed fraud and then systematically attempted to avoid honoring the guaranties. In May 1982, sellers contended that the Phanny's Phudge guaranty had terminated because buyers unreasonably withheld their approval of new tenants. In July 1982, sellers changed their position and asserted the Phanny's Phudge guaranty had ended because the tenant remained current with its rent for three consecutive months. Sellers made the assertion even though (1) Devcorp's president disputed the claim in an

internal memo; and (2) Devcorp's own property manager had served Phanny's Phudge with three-day notices to quit for nonpayment of rent during the months in question.

Moreover, in June 1983, sellers began to dismantle Devcorp by selling off its assets and firing its employees. After sellers encouraged buyers to evict Phanny's Phudge from the store, they later asserted the eviction had terminated the lease guaranty. In May 1984, sellers asked buyers to bill them for the unpaid rents. When buyers complied with the request, sellers ignored the billings. Following the promise by Hahn Inc. to guarantee the rent of a replacement tenant for Phanny's Phudge, Devcorp quickly rescinded the offer and in its place issued its own guaranty. Finally, a week later, Devcorp informed buyers that it considered all the guaranties to be null and void. Based on this record, substantial evidence exists from which a jury could infer that sellers made the guaranties without an intent to perform them.

Sellers also urge that as a matter of law they cannot be held liable for fraud because they partly performed the guaranties. (See *Kaylor* v. *Crown Zellerbach, Inc.* (9th Cir. 1981) 643 F.2d 1362, 1368.) As evidence of their part performance, sellers point to the $34,818 credit they gave buyers against the promissory note in October 1984. The contention is unavailing. First, it took sellers almost two and a half years to give the credit. Second, it is arguable whether sellers actually gave up anything for the credit because they made it after receiving from buyers the unlawful detainer judgment against Phanny's Phudge. Third, and most importantly, at the same time sellers credited the promissory note, they reiterated their position that the guaranties were no longer valid.

## II. *Whether It Was Prejudicial Error to Allow the Jury Knowledge of Sellers' Wealth*

■ Sellers argue the trial court committed prejudicial error when it failed to heed the mandatory language of section 3295 and grant them a protective order excluding evidence of their wealth from the jury until the panel found them liable for fraud. Buyers counter that sellers waived the mandatory command of the statute by not raising the motion in a timely fashion. As the facts of this case clearly illustrate, a statute written in mandatory language must nonetheless come within the trial court's discretion when a party delays seeking its rights to the detriment of the opposition.

■ Subdivision (d) of section 3295 provides that "[t]he court *shall*, on application of any defendant, preclude the admission of evidence of that

defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294. Evidence of profit and financial condition shall be admissible only as to the defendant or defendants found to be liable to the plaintiff and to be guilty of malice, oppression, or fraud. Evidence of profit and financial condition shall be presented to the same trier of fact that found for the plaintiff and found one or more defendants guilty of malice, oppression, or fraud." (Italics added.)

On its face, section 3295, subdivision (d) is a codification of the presumption that evidence of a defendant's wealth can induce fact finders to abandon their objectivity and return a verdict based on passion and prejudice. (See *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 121 [284 Cal.Rptr. 318, 813 P.2d 1348].)

Sellers urge the only deadline imposed by section 3295, subdivision (d) is that the motion be made before the trier of fact delivers a verdict finding a defendant liable for acts worthy of assessing punitive damages. We refuse to subscribe to such a rule. In our view, it is manifest that a party may be estopped from claiming a statutory right if untimely asserted. It is a maxim of jurisprudence that "[t]he law helps the vigilant, before those who sleep on their rights." (§ 3527.)

A request under section 3295, subdivision (d) is essentially a motion *in limine*, and ordinarily should be made before trial. (See 3 Witkin, Cal. Evidence (3d ed. 1986) § 2011(a), p. 1969; 2 Cal. Trial Objections (Cont.Ed.Bar 2d ed. 1984) § 1.2, p. 4; Cal. Judges Benchbook, Civil Trials (CJER 1981) § 3.12, pp. 72-73.)

In the matter at hand, sellers have no excuse for their delay in seeking the bar of the statute. From the inception of buyers' lawsuit, sellers had notice punitive damages were being sought. Yet, they inexplicably waited to bring the motion until after buyers had already (1) told the jury twice in opening argument Hahn Inc. was a billion dollar company; (2) cross-examined a witness on the subject of Hahn Inc.'s wealth; and (3) made a motion to compel production of the sellers' financial records.

More egregious, though, is the fact sellers withheld the motion until buyers were to begin the presentation of their case. Apparently in response to sellers' unwillingness to voluntarily produce their records, buyers had Vernon Schwartz, a Hahn Inc. executive, standing by to testify as their initial witness. Because he was from out of town, buyers possessed a legitimate

reason to have Schwartz testify at the earliest possible moment. It was only at this late date—after months of pretrial proceedings and five days of testimony—that sellers insisted the court was under a mandatory duty to exclude evidence of their finances.

This litigation, we think, aptly demonstrates that the mandatory effect of section 3295, subdivision (d), like many other rights, may be lost by a defendant who fails to act promptly to preserve its protection. Our decision, of course, does not mean a defendant who chooses to delay the exercising of his statutory right before trial is totally precluded thereafter from objecting to evidence of his financial status. Even before the enactment of subdivision (d), the trial court had discretion to exclude such evidence as being unduly prejudicial. (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 392-393 [196 Cal.Rptr. 117]; Code Civ. Proc., § 598.)

Turning to the record at hand, we cannot say it was an abuse of discretion for the trial court to deny sellers' motion. The jury learned in opening argument, and also during cross-examination of one of sellers' own witnesses, that Hahn Inc. was a company of substantial worth. From these events alone, the trial court reasonably could have concluded it would be impossible to "unring the bell." More significantly, however, the court also could have found that to grant the motion in the midst of trial would have been prejudicial to buyers. As noted, buyers had an out-of-town witness waiting to discuss sellers' finances when sellers made their motion. In conclusion, sellers cannot complain on appeal they were denied the benefit of section 3295, subdivision (d) when it was within their power to make a timely motion.

 Sellers also contend that even if it was not reversible error for the court to have denied their belated request for a protective order, we must still grant them a new trial because buyers impermissibly used evidence of their wealth in closing argument to inflame the passion and prejudice of the jury. We disagree.

Both the pauper and the millionaire are entitled to be treated fairly before the trier of fact. (*Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 606 [136 Cal.Rptr. 787]; *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 388 [38 Cal.Rptr. 183]) This follows from the rule that evidence of a party's wealth is generally irrelevant to the issue of liability. "Justice is to be accorded to rich and poor alike, and a deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case." (*Hoffman* v. *Brandt* (1966)

65 Cal.2d 549, 552-553 [55 Cal.Rptr. 417, 421 P.2d 425].) ■ However, where liability and punitive damages are tried in a single proceeding, evidence of wealth is admissible. "[W]hile in the ordinary action for damages information regarding the adversary's financial status is *inadmissible*, this is not so in an action for punitive damages. In such a case evidence of defendant's financial condition is admissible at the trial for the purpose of determining the amount that it is proper to award [citations]. The relevancy of such evidence lies in the fact that punitive damages are not awarded for the purpose of rewarding the plaintiff but to punish the defendant. Obviously, the trier of fact cannot measure the 'punishment' without knowledge of defendant's ability to respond to a given award." (*Coy* v. *Superior Court* (1962) 58 Cal.2d 210, 222-223 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678], italics in original.)

■ In urging the jury to punish sellers, buyers' counsel stated: "Think about just how big this company is. When you talk about them beating up on people that are smaller than they are. . . . There is probably nothing, in my opinion, that is more sickening in our society than a company that will take as much money as they've got and use it to pound away on you legally. . . . There's one thing we can do about it. We can take away some of their money so they don't have that money at least anymore to grind people into the dirt. . . . You've got to send a message loud enough to them that they won't treat people this way . . . That they wouldn't use their money to buy lawyers to try to legally nail your knees to the floor."

Because sellers failed to timely assert their right to a protective order under subdivision (d) of section 3295, buyers had an opportunity to try the fraud and punitive damage issues in a unified proceeding. In light of that fact, we think nothing said by buyers in argument was inappropriate. The purpose behind section 3294, the exemplary damages statute, is to punish and deter the defendant for his wrongful conduct. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980]; *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1098 [234 Cal.Rptr. 835]; *Emerson* v. *J. F. Shea Co.* (1978) 76 Cal.App.3d 579, 594 [143 Cal.Rptr. 170].) To achieve that goal, the jury's attention must be focused on a number of considerations: "One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Citations.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of

punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence [citation], will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.]" (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928.) Viewed under these principles, it cannot be said buyers' counsel strayed beyond the bounds of his right to fairly comment on the state of the evidence.

Moreover, evidence of sellers' wealth was relevant not only to guide the jury in its assessment of the proper amount of punitive damages to award, but also as proof that sellers intended to oppress buyers into submission.

At this juncture, we think it important to further note that substantial evidence supports the jury's determination that an award of punitive damages was proper because buyers met their burden of proving fraud by clear and convincing evidence. (See *Patrick* v. *Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1576 [267 Cal.Rptr. 24]; § 3294, subd. (a).) Sellers would have us believe they were guilty of nothing more than bad judgment and overzealousness. The jury, however, viewed the evidence differently, drawing the conclusion that sellers fraudulently promised to honor the guaranties. We are bound by that decision, because as our detailed recitation of the facts demonstrates, the jury's characterization of the evidence is supported by the record. Thus, we are convinced that the references to sellers' wealth in closing argument did not impermissibly sway the jury to render verdicts against the sellers.

### III. *Whether Buyers' Trial Counsel Committed Prejudicial Misconduct*

Sellers complain they were denied a fair trial because in closing argument buyers' counsel committed purported acts of misconduct, to wit, he (1) suggested buyers sought a change of venue because sellers' attorneys used political contributions to exert influence over the judiciary in Riverside County; (2) intimated sellers paid their attorneys to lie for them in court and to conceal evidence; (3) misrepresented the amount of money buyers ultimately spent for the shopping center; (4) appealed to the jury to be sympathetic to Waranch; and, (5) implied that Waranch might donate an award of punitive damages to charity. Sellers also assert buyers' attorney poisoned the proceedings by abusing witnesses, making improper objections, and repeatedly propounding argumentative questions. We do not agree.

First, we find no misconduct in buyers' suggestion that sellers made misrepresentations and attempted to conceal evidence. These remarks are

supported by the record. As described above, Vaughn Hapeman, Devcorp's corporate counsel, wrote a letter to buyers in July 1982 contending the Phanny's Phudge lease guaranty had terminated because the tenant had paid its rent for three consecutive months. Hapeman made the claim despite the fact that Devcorp's president, Stanley Gribble, had made notations on an internal copy of the correspondence stating: "Vaughn. Before you make these statements be sure Phanny's was current for 3 months on all rents. My opinion is they were not current on all accounts for 3 months and have not been. Suggest you change your position."

At trial, sellers called Hapeman as a witness and had him testify concerning the letter. They then offered into evidence a copy of the correspondence without Gribble's comments. In closing argument, buyers' counsel directed the jury's attention to an unedited copy of the letter which contained the incriminating margin notes. Buyers' attorney told the panel: "Reasonable men might disagree as to whether facts demonstrate A or B, but reasonableness has nothing to do with lying and distorting and cheating and trying to suppress evidence."

In another instance before the jury, buyers' attorney charged the opposition of suppressing evidence by not calling Sue Cook, an earlier announced witness. Cook was Devcorp's manager of the shopping center. In his testimony, Hapeman stated Cook had confirmed to him that Phanny's Phudge was not delinquent with its rent for three straight months. On cross-examination, buyers confronted Hapeman with Cook's denial that she had ever spoken to him. Subsequently, buyers had Cook testify that one of sellers' attorneys during the trial had telephoned her and stated it was unnecessary for her to appear in court.

Directing the jury's attention to this episode, buyers' attorney stated: "So you would not have ever heard from Miss Sue Cook at that point except for the fact we got hold of her and we brought her back in here. And now I know [sellers' attorney is] sighing and going crazy. I don't blame him. I was pretty embarrassed for him at the time, too."

Buyers' counsel also accused sellers' attorney of not being forthright on two other minor matters concerning his involvement in drafting a pleading and propounding certain interrogatories. He argued to the jury: "But when you're caught lying or you're caught cheating or you're caught stealing, it's real hard to look cool. That's when you start to stutter and stammer, and you look unorganized and you can't put it together, and you just end up looking stupid. . . . [¶] It's simply because it's hard to look good when you have to uphold the lies of your client. [¶] And then you can add insult to injury by

continuing to outright tell lies to you, for example, over the last three weeks. [¶] It's probably fairly clear to you that I've been pretty angry in this case."

■ Personal attacks on opposing parties and their attorneys, whether outright or by insinuation, constitute misconduct. (*Stone* v. *Foster* (1980) 106 Cal.App.3d 334, 335 [164 Cal.Rptr. 901].) Such behavior only serves to inflame the passion and prejudice of the jury, distracting them from fulfilling their solemn oath to render a verdict based solely on the evidence admitted at trial. (*Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 484-485 [130 Cal.Rptr. 786].) Lack of civility between counsel, moreover, only breeds public disrespect for the judicial process. ■ Although we regret that buyers' attorney personalized his argument in such a fashion, we are left unconvinced that, on the whole, he exceeded his right to comment on the state of the evidence. Here, the facts surrounding the making of Vaughn Hapeman's letter, and the way those events were portrayed to the jury, represented highly relevant circumstantial evidence of whether sellers ever intended to honor the lease guaranties. Buyers also had the right under the facts to comment on why sellers suddenly attempted to suppress the testimony of one of their scheduled witnesses. (*Freitas* v. *Peerless Stages, Inc.* (1952) 108 Cal.App.2d 749, 761 [239 P.2d 671, 33 A.L.R.2d 778]; Evid. Code, § 413.)

We next turn to whether buyers' attorney misrepresented the price his clients paid for the shopping center. ■ While trial counsel is entitled to argue his interpretation of the evidence to the jury, he has no right to cite facts unsupported by the evidence. (*Malkasian* v. *Irwin* (1964) 61 Cal.2d 738, 747 [40 Cal.Rptr. 78, 394 P.2d 822].) This is what sellers claim buyers' counsel did in order to convince the jury that sellers fraudulently made the lease guaranties. As described earlier, buyers argued that sellers underestimated the cost of constructing the shopping center. Sellers committed fraud, according to buyers, because the project only would turn a profit if the rents from Franchise and Phanny's Phudge were capitalized into the final purchase price.

Sellers essentially claim that buyers' attorney had no factual basis for making the argument because he knew that they realized a $3 million profit from "selling" Stanley Gribble a 16 percent interest in the shopping center. The contention is not supported by the evidence. Gribble never testified that he paid money for his ownership interest. Rather, the record reveals that he had "earned" his share of the shopping center as part of what he characterized as the "sweat equity" included in his executive compensation package

from Devcorp. In other words, Gribble received his interest in the shopping center for services rendered to Devcorp.

Having not parted with cash, the exact sum Gribble "contributed" to the profitability of the transaction is questionable, to say the least. Considering this fact, we think buyers' attorney could fairly argue that sellers committed fraud to insure their profits through the capitalization of the Phanny's Phudge and Franchise leases.

 We next turn to sellers' remaining contentions regarding attorney misconduct. First, we find that buyers' counsel blatantly did commit misconduct when he intimated sellers could influence judges in Riverside County through political contributions made by sellers' attorneys. He also improperly appealed to the jury's sympathy when he suggested buyers might donate the punitive damages to charity. (Cf. *Lewis* v. *Union Pacific R. R. Co.* (1954) 127 Cal.App.2d 280, 283 [273 P.2d 706].) Even so, any prejudice from these statements were cured when the trial court admonished the jury to disregard the statements. (*Mendoza* v. *Gomes* (1956) 143 Cal.App.2d 172, 179 [299 P.2d 707].)

We also think buyers' counsel was guilty of misconduct to a lesser degree when he insinuated that sellers' attorneys were "whores" who would lie in court for their clients. This remark, along with a number of other purported acts of misconduct, was left unchallenged by sellers and, thus, must be deemed waived.

"A party is foreclosed from complaining on appeal of misconduct during arguments to the jury where his counsel sat silently back during the arguments, allowed the alleged improprieties to accumulate without objection, and simply made a motion for a mistrial at the conclusion of the argument. [Citation.]" (*Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 860 [139 Cal.Rptr. 888, 93 A.L.R.3d 537]; see also *Horn* v. *Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].)

Citing *Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341 [133 Cal.Rptr. 42], sellers contend that multiple objections need not be raised when an adversary engages in flagrant and repeated episodes of misconduct. It is also important to note that *Simmons* states: " 'The ultimate determination of [the issue of attorney misconduct] rests upon [the appellate] court's 'view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all

the circumstances.' [Citation.]" (*Id.* at p. 351.) To this list we prominently would add the strength of the offending attorney's case. Here, there was substantial evidence of sellers' fraud. Thus, even if buyers' counsel was guilty of a pervasive pattern of misconduct, we think it had an innocuous effect on the jury's overall conclusion that sellers had committed a tortious act.

## IV. *Whether the Record Supports the Finding That Devcorp Was the Alter Ego of Hahn Inc.*

 Hahn Inc. complains buyers cannot pierce its corporate veil because the undisputed evidence established that it had no interest in the corporation at the time the 1982 lease guaranties were created. We find the contention meritless.

 "The law as to whether courts will pierce the corporate veil is easy to state but difficult to apply." (*Talbot* v. *Fresno-Pacific Corp.* (1960) 181 Cal.App.2d 425, 432 [5 Cal.Rptr. 361].) Because it is founded on equitable principles, application of the alter ego "is not made to depend upon prior decisions involving factual situations which appear to be similar. . . . 'It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.' " (*McLoughlin* v. *L. Bloom Sons Co., Inc.* (1962) 203 Cal.App.2d 848, 853 [24 Cal.Rptr. 311]; see *Stark* v. *Coker* (1942) 20 Cal.2d 839, 846 [129 P.2d 390]; *Jack Farenbaugh & Son* v. *Belmont Construction, Inc.* (1987) 194 Cal.App.3d 1023, 1033 [240 Cal.Rptr. 78].) Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence. (*Jack Farenbaugh & Son* v. *Belmont Construction, Inc., supra,* 194 Cal.App.3d at p. 1032.)

Hahn Inc. relies on *Riddle* v. *Leuschner* (1959) 51 Cal.2d 574 [335 P.2d 107]. There, the California Supreme Court reversed a judgment, based on an alter ego theory, against a manager of businesses owned by two corporations. The court stated: "It is undisputed that he held none of the stock, and there is no evidence that he had any interest as an owner in the business operated by either of the two corporations or that he had a right to share in any profits they might make. Instead, he received a monthly salary. Under all the circumstances, he is to be regarded as having been a managing employee of the two companies, and his control over their affairs must be treated as that which would be exercised by a managing agent rather than that of a shareholder or owner. It follows that there was not such unity of 'interest and ownership' between [the manager] and the corporations that the separate

personalities of the corporations and the individual no longer existed, within the meaning of the rule. . . ." (*Id.* at p. 580.)

*Riddle* stands for the proposition that it would be unfair to impose personal liability on an individual for corporate conduct unless he had an ownership interest in the company. At the same time, under the facts of this case, it would be as equally unfair to permit Hahn Inc. to escape liability for the unperformed guaranties simply because it earlier had transferred ownership of Devcorp to, among others, a sister corporation within the Trizec family of companies.

"Usually, a disregard of the corporate entity is sought in order to fasten liability upon individual stockholders. . . . 'It has been stated that the two requirements for application of this doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' [¶] However, only a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual. 'A very numerous and growing class of cases wherein the corporate entity is disregarded is that wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an *instrumentality, agency, conduit, or adjunct of another corporation.*' [Citations.]" (*McLoughlin* v. *L. Bloom Sons Co., Inc., supra*, 206 Cal.App.2d 848, 851-852, italics added.)

Because society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation, sound public policy dictates that imposition of alter ego liability be approached with caution. (*Cascade Energy and Metals Corp.* v. *Banks* (1990) 896 F.2d 1557, 1576.) Nevertheless, it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity. Here, buyers essentially tried the case based on a single-enterprise theory of liability. In closing argument to the jury, buyers argued the evidence established that the line of command ran from Trizec at the top, with Hahn Inc. in the middle, and Devcorp at the bottom.

Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. The theory has been described as follows: " 'In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise;

and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity with the assets of both, and charged it with the liabilities of one or both." (2 Marsh's Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416, quoting a law review article by Professor Berle found at 47 Colum. L. Rev. (1947) 343, 350.)

In *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc.* (1958) 166 Cal.App.2d 652 [333 P.2d 802], defendants formed Greendale Park, Inc., and the Ralmor Corporation to build homes on undeveloped lots. Defendants transferred the real property to Greendale Park and later had that corporation contract with Ralmor for the construction. Plaintiff sold sash doors, frames and jambs to Ralmor. When Ralmor did not pay for the goods, plaintiff sued each corporation asserting they were both one and the same. The trial court entered judgment against both corporations under the alter ego theory.

The Court of Appeal in *Pan Pacific* affirmed the judgment, stating: "Upon the basis of the . . . evidence the trial court was warranted in concluding, as it did, that each corporation was but an instrumentality or conduit of the other in the prosecution of a single venture namely, the construction and sale of houses upon the tract in question. . . . There was such unity of interest and ownership that the separateness of the two corporations had in effect ceased and an adherence to the fiction of a separate existence of the two corporations would, under the circumstances here present, promote injustice and make it inequitable for Greendale to escape liability for an obligation incurred as much for its benefit as for Ralmor." (166 Cal.App.2d at pp. 658-659.)

We find there is substantial evidence to support the conclusion that Hahn Inc. and Devcorp formed a single enterprise for the purpose of committing a continuing fraud against buyers. First, the evidence that Hahn Inc. had guarantied $43.2 million in loans and loan commitments to Devcorp strongly suggests Devcorp was undercapitalized for a company in the business of developing shopping centers. Likewise, in 1978 Hahn Inc. issued two guaranties to buyers to protect the $2 million cash downpayment they made to Devcorp. Moreover, besides the loan guaranties, Hahn Inc. temporarily guarantied the Phanny's Phudge lease, despite the fact that Hahn Inc. no longer had a stock ownership interest in Devcorp. These guaranties indicate that Devcorp's survivability as a developer was intertwined with its dependence on Hahn Inc.

Furthermore, Ernest Hahn and Robert Lees sat as directors on the boards of Hahn Inc. and Devcorp. When Devcorp's board of directors fired the corporation's executives and staff, Hahn Inc. used its employees, including its corporate counsel, to continue to manage what remained of the business. In short, the trial court reasonably could have concluded that Hahn Inc. and Devcorp were combined into a single enterprise to defraud buyers.

Sellers next assert that even assuming there was a unity of interest between Hahn Inc. and Devcorp, the record lacks substantial evidence to support a finding that justice required the trial court to pierce the corporate veil. They premise their argument on the fact the parties stipulated at trial that Devcorp was worth $4.1 million, an amount sufficient to satisfy the $1.27 million award of compensatory damages and a suitable punitive damage award. They contend buyers dragged Hahn Inc., with its sizeable assets, into the lawsuit only to increase the funds available for a punitive damage award. We are unpersuaded by the claim.

Sellers cite *Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982 [149 Cal.Rptr. 119] in support of their argument. There, plaintiffs obtained a judgment awarding fraud and punitive damages against two affiliated corporations. The trial court, however, had entered a judgment of nonsuit in favor of the corporate parent. In affirming the judgment, the appellate court stated: "We conclude that more is required than solely a parent-subsidiary corporate relationship to create liability of a parent for the actions of its subsidiary. [¶] . . . The sole basis for holding [the parent] liable would be to enable the plaintiffs to obtain an increased award of punitive damages because of the substantial net worth of the parent. There is no factual justification to do so." (*Id.* at p. 1001.) The present case is obviously distinguishable from *Walker*. Hahn Inc. actively participated in the sale of the shopping center from the very beginning to the very end. Hence, there is a sufficient factual basis for allowing buyers to pierce the corporate veil of Devcorp.

Finally, as explained in the next section, we have reduced substantially the jury's award of compensatory and punitive damages. Still, we think it appropriate to maintain Hahn Inc.'s liability for the judgment. Even though at trial the parties stipulated that Devcorp was worth $4.1 million, it is unclear from the record how much of that amount is composed of buyers' promissory note, which buyers presumably have been paying down throughout this litigation. Moreover, buyers suggest in their respondent's brief that by the time this appeal becomes final, sellers could totally deplete Devcorp of all its assets.

For all the above reasons, we will uphold the trial court's determination that Devcorp is the alter ego of Hahn Inc.

## V. Whether the $1.27 Million Fraud Award Is
## Excessive as a Matter of Law

We agree with sellers that the $1.27 million fraud award is excessive, but not on the grounds urged by them. Before oral argument we requested counsel to address whether the injurious effect of the fraud was limited to the value of the lease guaranties or rather infected the total worth of the shopping center. (See Gov. Code, § 68081.) Because we now conclude that the record is devoid of any substantial evidence indicating that sellers' tortious conduct resulted in buyers incurring $1.2 million in damages, that award must be reversed.

 Although the law commits the responsibility for determining the amount of damages suffered by a plaintiff to the jury, its decision cannot be allowed to stand where the award as a matter of law is excessive, or is so grossly disproportionate as to raise a presumption that the panel based its result on passion or prejudice. (*Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39]; *Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727 [236 Cal.Rptr. 633].)

 To recover damages for fraud, a plaintiff must have sustained damages proximately caused by the misrepresentation. (*State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 528 [88 Cal.Rptr. 246]; §§ 3333, 3343, subd. (a)(4)(iii).) A damage award for fraud will be reversed where the injury is not related to the misrepresentation. (*Gray* v. *Don Miller & Associates, Inc., supra*, 35 Cal.3d 498, 504.)

For fraud arising out of the purchase, sale, or exchange of property, section 3343 provides that a plaintiff is entitled to his "out-of-pocket" damages. The formula for determining "out-of-pocket" losses under the statute is the difference between the actual value of what the defrauded person parted with and the actual value of what he received in return. The statute also allows a plaintiff under certain conditions to recover his lost profits as a form of consequential damages. (§ 3343, subd. (a)(4).)

When considered against these standards, the shopping center's appraised value in 1982 simply cannot constitute substantial evidence to support a causal connection between sellers' fraud and $1.27 million in damages. First, buyers' counsel admitted in closing argument before the jury that he never seriously considered $1.27 million to be the extent of his clients' damages.

Second, sellers did not misrepresent the value of the shopping center. Their wrongful conduct was to guaranty the leases without any intent to honor the obligations. Lastly, Thomas Marshall (sellers' appraiser) testified that his valuation of the property took into account the rental income based on an industry average of a 94 percent occupancy rate. As such, the appraisal encompassed the rents from the Phanny's Phudge and Franchise leases. With those rents included in the appraisal, any diminution in the property's value had to arise separate and apart from the fraudulent acts of sellers. Hence, the appraisal at best only demonstrated that buyers overpaid for the shopping center because they misjudged its worth.

As an alternative basis for damages, buyers' counsel at oral argument proposed that we reduce the fraud award to $639,878, the amount his clients paid for capitalizing the Phanny's Phudge and Franchise leases. Again, we have come across no evidence in the record for finding a sufficient relationship between sellers' fraud and a $639,878 loss incurred by buyers. Sellers did not misrepresent or hide from buyers the financial conditions of Phanny's Phudge and Franchise. By their own admissions, buyers knew at the time of closing that these two tenants were commercially unsound. It seems self-evident that when a purchaser of rental property capitalizes a stream of future income he or she assumes the risk of insolvencies, economic turndowns, and depressed property values. A prudent buyer would thus take these risks into consideration and negotiate for a capitalization rate sufficient to protect his investment.

We realize, of course, that the guaranties, acting as a form of insurance, would influence a buyer in his choice of a capitalization rate. Common sense dictates the greater the protection offered by the guaranty, the more a buyer will pay for the stream of income. In this regard, sellers' wrongful conduct had some measurable effect on the value placed on the Phanny's Phudge and Franchise leases. We would bestow, however, an extraordinary windfall on buyers if we allowed them to recover damages for that portion of the capitalized rents left untainted by the fraud. Here, it is difficult to perceive how the fraud was a substantial factor in causing $639,878 in damages. The capitalization rate in the instant case was set at 7 percent in 1978 and remained the same at closing, even though buyers had knowledge of the financial difficulties facing Phanny's Phudge and Franchise. One would think that if buyers had desired to shift more of the risk of these long-term leases to sellers, buyers would have negotiated guaranties lasting beyond the payment of three or six consecutive months of rents. This buyers did not do, perhaps because of sellers' superior bargaining power. On the other hand,

buyers may have settled for such minimal protection because they believed suitable replacement tenants could be secured with little effort.

In any event, it plainly appears that in regard to the capitalization of the rents, the lease guaranties were not the driving force behind the deal. Analyzed in this light, the causal relationship between the fraud and a devaluation of the capitalized rents is too tenuous to support an award of $639,878.

In our view, the damages resulting from sellers' fraud must be limited to the diminished value of the lease guaranties. This is where the strongest line of causation exists. It is also where the most reliable evidence of buyers' damages can be found. While it would be approaching mere speculation to place a market value on the guaranties under these facts, a true gauge of their worth can be established under the lost profit provision of section 3343. Subdivision (a)(4) of the statute permits a victim of fraud to recover "an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud . . . ." The subdivision further commands, however, that lost profits can only be sought if the defrauded party acquired the property for profit, reasonably relied on the fraud, and that his damages were proximately caused by the wrongful conduct. All of these conditions are met in the case at bar.

A defrauded party need not prove an "out-of-pocket" loss before seeking consequential damages. (*Stout* v. *Turney* (1978) 22 Cal.3d 718, 729-730 [150 Cal.Rptr. 637, 586 P.2d 1228].) His damages, though, must be measured from the date the promise is breached, not when the promise was made. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co, supra*, 66 Cal.App.3d 101, 145-146; see also *Pao Ch'en Lee* v. *Gregoriou* (1958) 50 Cal.2d 502, 505 [326 P.2d 135].) Here, we are presented with multiple breaches transpiring each time sellers refused to pay the rents owed under the guaranties. In its award for breach of contract, the jury found that the breaches occurred each month until the guaranties terminated in 1986. Since that award ($232,393) effectively compensated buyers for their lost profits, it is also the appropriate measure of buyers' damages under the fraud theory. Finally, because the breach of contract award has been left unchallenged by sellers, its utilization also allows us to modify the fraud award without the need of a new trial.

## VI. *Whether the Punitive Damage Award Must Also Be Reduced*

Sellers insist the punitive damage award cannot be upheld because there is no reasonable relationship between the award's size and (1) the reprehensi-

bility of their conduct; (2) the injuries suffered by buyers; and, (3) their net worth. (See *Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d 910, 928.) In light of our holding that the jury's $1.27 million fraud award was not supported by substantial evidence, we agree that the $10 million award for punitive damage must be reduced.

The public policy behind punitive damages is to prevent future misdeeds by punishing the wrongdoer and making an example out of him for others not to follow. (*Adams* v. *Murakami, supra*, 54 Cal.3d 105, 110.) While on appeal all three factors set forth in *Neal* must be satisfied, the "most important question is whether the amount of the punitive damages award will have deterrent effect—without being excessive." (*Id.* at p. 111.)

Here, a $10 million award would be grossly disproportionate both in comparison to buyers' compensatory losses and the gravity of sellers' misconduct. The case at bar is not an instance of a heartless conglomerate oppressively depriving a widow and her small children of the family homestead. Buyers were sophisticated real estate developers with the financial resources to weather the type of sharp business practices found in the present litigation.

This is not to say that sellers' wrongdoing should go unpunished. We conclude, however, that the ends of justice and judicial economy require us to limit the punitive damage award to $2 million. First, a $2 million award generally preserves the jury's 7.9 to 1 ratio between compensatory and punitive damages. Based on the evidence presented, such a ratio is well within reason, and with the reduced compensatory damages, results in a punishment that is commensurate with sellers' culpability.

Second, we believe a $2 million award still sends a forceful message to sellers that they cannot fraudulently induce parties to enter into agreements without penalty. Besides punishing sellers, the award also acts as a deterrent against future misconduct. Although sellers have a combined net worth of nearly a half billion dollars, they will no doubt think twice before fraudulently entering into another contract.

Lastly, the trial below was an arduous and exhaustive affair, spanning more than one month. Buyers left no stone unturned in proving the reprehensibility of sellers' fraud. There is little likelihood that at a retrial buyers could produce additional evidence establishing sellers were guilty of any greater wrongdoing than shown by the record which now exists. In other words, the litigation below has set the "outer limits" of sellers' punishment. While the amount of punitive damages to be awarded is within the discretion

of the jury, any amount higher than $2 million would certainly be the result of passion and prejudice. When required by justice, a reviewing court should modify a punitive damage award to ensure that the public policies behind its making are served. (*Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439, 453 [129 Cal.Rptr. 797]; *Gerard* v. *Ross* (1988) 204 Cal.App.3d 968, 980 [251 Cal.Rptr. 604].)

As their last complaint, sellers contend California's system for imposing punitive damages violates both their state and federal constitutional rights to due process. Specifically, they urge that California law is unconstitutional because defendants cannot predict the size of a possible award and juries are given inadequate guidelines for assessing penalties.

Today, the constitutionality of punitive damages, both on the state and federal levels, is a major topic of discussion. The California Supreme Court has recently held that the plaintiff must prove a defendant's wealth before punitive damages can be imposed. (*Adams* v. *Murakami, supra,* 54 Cal.3d 105, 123.) Additionally, the United States Supreme Court within this year has determined that the common law approach to awarding punitive damages is not per se unconstitutional. (*Pacific Mut. Life Ins. Co.* v. *Haslip* (1991) 499 U.S. __ [113 L.Ed.2d 1, 111 S.Ct. 1032].) Under the common law method, "[T]he amount of the punitive damages is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable." (499 U.S. at p. __ [113 L.Ed.2d at p. 18, 111 S.Ct. at p. 1042].)[7]

The high court in *Haslip* held that Alabama's system of awarding and reviewing punitive damage verdicts provided Pacific Mutual with due process of law. The trial court there had instructed the jury on the purpose of punitive damages, that the making of an award was discretionary, and that the panel " 'must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong.' [Citation.]" (499 U.S. at p. __ [113 L.Ed.2d at p. 20, 111 S.Ct. at p. 1044].)

Secondly, the *Haslip* court noted that on a postverdict challenge to a punitive damage award, trial courts in Alabama are required to reflect on the record their reasons for either approving or disturbing the verdict. Moreover, the factors which the trial courts in Alabama can consider are the culpability

---

[7]Section 3294 is California's codification of the common law on punitive damages. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 66, fn. 13 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

of the defendant, the need to deter, and the impact on the parties, including third persons. (499 U.S. at p. __ [113 L.Ed.2d at p. 20, 111 S.Ct. at p. 1044].)

Lastly, the court in *Haslip* pointed out that Alabama's Supreme Court measured punitive damage verdicts against a number of criteria "to ensure that the award does 'not exceed an amount that will accomplish society's goals of punishment and deterrence.' [Citations.]" (499 U.S. at p. __ [113 L.Ed.2d at p. 22, 111 S.Ct. at p. 1045].)

In contrast, the California Supreme Court in *Adams* recognized that the basis for review of punitive damage verdicts in our state (setting them aside when the awards are deemed to be the result of passion or prejudice) may not pass constitutional scrutiny because it resembles other state schemes criticized in *Haslip*. (*Adams* v. *Murakami* at p. 118, fn. 9.) The *Adams* Court, however, refused to consider the issue, noting that it and the United States Supreme Court had remanded a number of decisions back to the California Court of Appeal for further consideration in light of *Haslip*. (*Ibid.*)

Addressing sellers' contentions, we first disagree with the notion that California juries are given inadequate guidelines to award punitive damages. In the instant case, the jury was instructed that an award of punitive damages was discretionary, and could only be made if they found sellers guilty of oppression, fraud, or malice. Additionally, the court informed the panel that punitive damages are awarded "for the sake of example and by way of punishment."

The trial court also directed the jury that "[i]n arriving at any award of punitive damages, you are to consider the following: [¶] 1. The reprehensibility of the conduct of [sellers]; [¶] 2. The amount of punitive damages which will have a deterrent effect on the [sellers] in light of [sellers'] financial condition; and [¶] 3. That the punitive damages must bear a reasonable relation to the injury, harm, or damage actually suffered by [buyers]." (See generally BAJI No. 14.71 (7th ed. 1989 rev. mod.) We think these instructions offer the same degree of protection against arbitrary jury decisions as found constitutionally acceptable in *Haslip*.

Secondly, the "passion and prejudice" standard of posttrial and appellate review required by California law does afford sellers an additional safeguard to ensure that the jury's award has not exceeded " 'an amount that will accomplish society's goals of punishment and deterrence.' " (*Pacific Mut. Life Ins. Co.* v. *Haslip, supra,* 499 U.S. __ [113 L.Ed.2d 1, 22, 111 S.Ct. 1032, 1045].)

██ On a motion for new trial, the trial court sits in its role as an independent trier of fact and may " '[d]isbelieve witnesses, reweigh evidence and draw reasonable inferences that are contrary to those drawn by the jury.' [Citation.]" (*Sanchez* v. *Hasencamp* (1980) 107 Cal.App.3d 935, 944 [166 Cal.Rptr. 118]; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 933; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 823 [174 Cal.Rptr. 348].)[8]

Although the trial court's denial of a motion for new trial should be given deference, an appellate court has the responsibility to intervene when the verdict is so palpably excessive to raise the presumption of passion and prejudice. (*Dumas* v. *Stocker* (1989) 213 Cal.App.3d 1262, 1266 [262 Cal.Rptr. 311]. Appellate courts must scrutinize punitive damage verdicts because they "constitute a windfall, create the anomaly of excessive compensation, and are therefore not favored in the law. [Citation.]" (*Ibid.,* fn. omitted.)

██ Moreover, application of the "passion and prejudice" standard does not occur in a vacuum, but is measured against the identical criteria utilized by the jury: reprehensibility of defendant's misdeeds, the ratio between the compensatory and punitive damages, and the relationship between the punitive damages and defendant's net worth. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928; *Adams* v. *Murakami, supra,* 54 Cal.3d 105, 110-111; *Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1010-1011 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125].) This quantum of critical evaluation thus makes certain that punitive damage verdicts will be limited to that amount of money necessary to accomplish the public policy of punishment and deterrence. In sum, the "passion and prejudice" test affords in posttrial proceedings and on appeal the same general degree of scrutiny as found in the Alabama review process.[9] (See *Liberty Transport, Inc.* v. *Harry*

---

[8]Unlike in Alabama, California law does not mandate that the trial court state on the record why it refused to interfere with the award. However, the trial court must specify in the record its reasons for disturbing the verdict. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 931; § 657.) Requiring a statement of reasons in the latter situation, serves the purpose of " 'encourag[ing] careful deliberation by the trial court before ruling on the new trial motion and [making] a sufficiently precise record to permit meaningful appellate review' [citation]." (*Neal, supra,* 21 Cal.3d at p. 931.) While an explanation of the trial court's decision to uphold the verdict would give an added degree of protection, we think, on the whole, California law affords defendants enough safeguards to satisfy the requirements of due process.

[9]The court in *Haslip* also observed that under Alabama law a reviewing tribunal can evaluate a punitive damage award in light of the duration of the defendant's conduct; defendant's awareness and concealment of its acts; the existence and frequency of similar past conduct; and the desirability of disgorging defendant of its illicit gain. Additionally, the courts in Alabama can consider as mitigating circumstances the imposition of criminal sanctions and the existence of other civil awards against the defendant for the same conduct. (*Pacific Mut.*

*W. Gorst Co.* (1991) 229 Cal.App.3d 417, 441 [280 Cal.Rptr. 159].) It is only when the award exceeds the amount needed to accomplish the goal of punishment and deterrence that an appellate court can conclude the jury acted on its passion and prejudice.

In the instant case, we have painstakingly detailed sellers' fraudulent conduct, taken notice of their net worth, and considered the amount of compensatory damages they caused buyers. From that, we have determined the punitive damage award must be reduced to $2 million to keep it in line with the actual compensatory losses suffered by buyers. In making its decision, the jury concluded that only a multimillion dollar damage award would be sufficient to punish and deter buyers. We agree. However, as we have already stated, in view of the fact that the actual amount of buyers' compensatory damages is $232,393, a punitive damage award exceeding $2 million would be excessive.

Finally, sellers insist that California's punitive damage law offends due process because a defendant is given no fair notice of the possible size of a punitive damage verdict. The argument is meritless. Seldom does an intentional tortfeasor know the extent of his liability at the time of his wrongful act. If what sellers are contending is that there should be a fixed ceiling on punitive damage liability regardless of whether that amount would punish and deter, then the proper audience for that idea is the California Legislature.

### VII. *The Award of Contractual Attorney's Fee Must Be Reversed*

A party is barred from collecting contractual attorney's fees in an action for fraud. (*Schlocker* v. *Schlocker* (1976) 62 Cal.App.3d 921 [133 Cal.Rptr. 485]; see also *Stout* v. *Turney, supra,* 22 Cal.3d 718, 730.) In their respondent's brief, buyers in effect have stated they desire to take under their fraud action. The award of contractual attorney's fees allocated to prosecute that claim, therefore, must be reversed. ■ However, sellers' declaratory relief lawsuit, which alleged that they had no liability to buyers due to the occurrence of certain events contemplated by the guaranties, clearly was "an action on the contract" within the meaning of subdivision (a) of section 1717.[10] Hence, buyers as the prevailing party in that litigation are

---

*Life Ins. Co.* v. *Haslip, supra,* 499 U.S. at p. __ [113 L.Ed.2d at p. 22, 111 S.Ct. at p. 1045].) We think the basic structure of the *Neal* test affords a defendant the opportunity to raise these and other relevant factors to attack the jury's punitive damage verdict.

[10]That section commands, in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party

entitled to recover their reasonable attorney's fees incurred in the defense of that action.

## VIII. *Sellers' Other Contentions*

Sellers have raised numerous other issues that we have reviewed and find unnecessary to discuss.

### DISPOSITION

The judgment is modified to reflect our decision to reduce respondents' award of fraud damages to $232,393 and the award of punitive damages to $2 million and is otherwise affirmed. The matter is remanded to the trial court for its determination and award of attorney's fees incurred by respondents in defense of appellants' declaratory relief action. Each side is to bear its own costs of appeal.

Gates, Acting P. J., and Fukuto, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 11, 1992.

---

who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . ."