Filed 2/26/14  Michaely v. Frey CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PATTI MICHAELY et al., | B243203 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. SC093092) |
| v. | |
| HERBERT FREY, Individually and as Trustee, etc., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elihu Berle, Judge.  Affirmed in part and reversed in part.

Ferguson Case Orr Paterson, Wendy Cole Lascher, John A. Hribar; Fennemore Craig Jones Vargas and Patrick J. Sheehan for Defendant and Appellant.

Saltzburg, Ray & Bergman and Paul T. Dye for Plaintiff and Respondent Patti Michaely.

_____

Herbert Frey appeals from a judgment awarding plaintiff Patti Michaely $5.35 million in damages under the Uniform Fraudulent Transfer Act (UFTA), Civil Code sections 3439 through 3439.12, and prejudgment interest based on a theory that Patti's ex-husband, Joshua (Josh) Michaely, gave Frey fraudulent deeds of trust to deter Patti's efforts to collect a $21 million debt Josh owed her following the Michaelys' divorce.[1] Frey maintains the judgment must be reversed as to two transfers because Patti failed to demonstrate she was injured by the fraudulent transfers, that liability was erroneously imposed under alter ego or aiding and abetting theories as to a transfer made to a third party entity, and that the award of prejudgment interest was erroneous.

We find that individual liability was improperly imposed on Frey as to the fraudulent transfer to a third party entity, and that prejudgment interest was improperly awarded on another fraudulent transfer as to which damages were uncertain. Frey's remaining contentions lack merit.

## PROCEDURAL BACKGROUND

Patti initiated this action in March 2007.[2] The operative second amended complaint (complaint), filed in July 2009, describes a multitude of real estate transactions by Patti's ex-husband Josh and his long-term companion, Galina Kubrak. Patti alleged 15 causes of action against Josh, Kubrak, respondents Herbert Frey and the Herbert Frey Revocable Family Trust Dated 11/22/1982 (Frey Trust),[3] and numerous entity defendants for fraudulent transfer, fraud, breach of fiduciary duty, cancellation of deeds of trust, quiet title and common counts, and seeks monetary, declaratory and injunctive relief and ejectment. Patti obtained default judgments against Josh and Kubrak. Frey was named a

---

[1] For clarity, we refer to Patti and Josh Michaely by their first names.

[2] Receiver, Robb Evans, was also a plaintiff, but is not a party to this appeal.

[3] The judgment in this action is against both Frey and the Frey Trust. Except where otherwise noted, we refer to respondents collectively as "Frey."

defendant to 11 causes of action, but only a single cause of action for fraudulent transfer in violation of UFTA remains at issue.[4]

Judge Berle conducted a 12-day court trial between April and October 2011. Before trial, Frey challenged the admissibility of deposition testimony by Josh and Kubrak. Following extensive briefing and hearings, which took place after the conclusion of evidence but before closing arguments, the court found the coconspirator exception to the hearsay rule applicable to the challenged testimony and allowed its admission. (Evid. Code, §§ 1223, 1224.) However, the court denied Patti's motion to amend the complaint to add claims for fraud and breach of fiduciary duty against Frey, as a coconspirator.[5]

The court found Frey liable for three fraudulent transfers: a $100,000 payment on a transaction involving a property in Beverly Hills, and two deeds of trust for $1.25 million and $2 million, respectively. An amended judgment of $5.5 million, including prejudgment interest, was entered on July 18, 2012.

## FACTUAL BACKGROUND[6]

*The Michaely Divorce, Kubrak and Frey*

In 1995, Patti filed a petition seeking dissolution of her marriage to Josh. The Michaely's marriage was dissolved in 1999. Josh subsequently filed a petition for bankruptcy. In 2001, the bankruptcy court issued a judgment declaring Josh's debts to Patti to be nondischargeable in bankruptcy.

---

[4] The only other claim pursued against Frey at trial was a common count for money had and received. Patti was denied recovery on that claim. She has not appealed from that, or any, ruling.

[5] The court found Frey would suffer prejudice by addition of new substantive claims for fraud and breach of fiduciary, distinct causes of action raising new facts he had not had an opportunity to address or defend.

[6] In accordance with the applicable standard of review, we summarize the facts in the light most favorable to Patti, giving her the benefit of every reasonable inference, and resolve any evidentiary conflicts in support of the judgment. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 481, fn. 1.)

In August 2005, the trial court awarded Patti in excess of $21 million in the marital dissolution action. That judgment was affirmed on appeal. (See *In re Marriage of Michaely* (2007) 150 Cal.App.4th 802.) By the time of this trial, Patti's judgment in the marital dissolution action had (with accrued interest, unpaid spousal support and attorney fees) grown to over $60 million.

Kubrak was Josh's long-term companion. Sometime between 1995 and 2000, Josh and Kubrak formed a conspiracy to hide Josh's assets from Patti using, among other things, fraudulent transfers of real property to parties controlled by Josh. To accomplish the goals of the conspiracy, Josh: (a) transferred numerous assets into Kubrak's name or into the names of other persons or entities he or Kubrak controlled; (b) formed numerous entities in Kubrak's name or the name of third parties he controlled to hold properties he owned; and (c) continued to place newly acquired properties and assets in the name of Kubrak or a controlled third party. In 2010, based on the allegations of conspiracy, aiding and abetting, fraud and fraudulent transfer, Patti obtained a $26 million judgment in this action against Kubrak, which we affirmed. (*Michaely v. Kubrak* (June 24, 2011, B221483, B223057) [nonpub. opn.] [2011 WL 2508271, *2].) Default was also entered against Josh in 2009.

Frey, a long-term acquaintance of Josh's, became involved in some of Josh's and Kubrak's real estate transactions in Fall 2001. Three of those transactions, to which we refer as the "Hillcrest property," the "Nine Property" deed of trust (DOT) and the "Tikva" DOT, are the focus of this appeal.

*The Hillcrest property*

In 2001, Josh acquired the right to purchase 1029 Hillcrest Drive, Beverly Hills from a third party. Josh transferred his right to purchase the Hillcrest property to Frey, and asked him to help Kubrak obtain the Hillcrest property by agreeing to take title and signing for the loan. Josh claimed credit problems prevented Kubrak from taking title. Josh also told Frey that he and Kubrak would make all the mortgage and loan payments. Frey agreed, and acquired title to the Hillcrest property via a grant deed which was recorded in November 2001. Frey knew at the time he agreed to act in Josh's stead that

4

Josh was involved in divorce proceedings with Patti and hiding assets from her, and agreed to act as Josh's "'beard'" or "'strawman'" for the purchase.

Josh handled all the details of the transaction involving the Hillcrest property. Frey gave no money or other value to Josh for his transfer of the Hillcrest property for title, purchase costs or mortgage payments. Frey never spoke with the seller or broker involved, did not see the Hillcrest property before the purchase, and did not know the purchase price. He signed purchase documents for the Hillcrest property without reading or reviewing them. Josh made the mortgage payments on the Hillcrest property. Frey's only obligation was to transfer the Hillcrest property when instructed to do so by Josh. Josh, directly or through Kubrak, retained possession and control of the Hillcrest property after title was transferred to Frey. The transfer and assumption of liabilities in connection with the Hillcrest property were concealed. Josh hid his financial interest in the Hillcrest property from Patti by using Frey as a strawman. Frey knew that by acting as Josh's strawman he was assisting Josh in illegal acts and that his name was being used to help conceal Josh's interest in the Hillcrest property from Josh's creditors. Josh offered, and Frey accepted, $100,000 to act as his strawman on the purchase of the Hillcrest property.

Frey "'sold'" the Hillcrest property to Kubrak on June 30, 2003. The sale was undertaken in a manner intended to defraud the lender financing the transaction in that: (1) escrow documents for the transaction reflected that Kubrak had made a down payment of $1.1 million for a property being sold by Frey for $2.9 million, on an "'as is'" basis; (2) the lender financed $1.885 million of the purchase price; (3) the terms of the sale, amended at the last minute, eliminated Kubrak's $1.1 million down payment and credited her for "repairs" in that amount (to a property sold on an "'as is'" basis); (4) the consequence of the changed escrow terms was that Kubrak put no money into escrow for the transaction; and (5) Josh, Kubrak and Frey deliberately defrauded the lender by misrepresenting that a substantial down payment would be made, and by creating the illusion that the transaction was between unrelated parties.

Josh's transfer to Frey of $100,000 was made at or shortly before Josh ostensibly became insolvent, and was intended to hinder, delay and defraud Josh's creditors,

5

including Patti.  The trial court found that Frey gave no legitimate value to Josh and did not act in good faith in connection with this transfer of funds.  The court found that "Frey joined with [Josh] and Kubrak in a conspiracy to defraud [Josh]'s creditors, including [Patti], when Frey agreed to act as [Josh]'s 'strawman' in the purchase of the Hillcrest Property."  Frey joined the conspiracy in October or November 2001, when he signed loan documents he knew would be submitted to a lender in connection with the purchase of the Hillcrest property.  Frey's acceptance of ownership and title to the Hillcrest property was another act in furtherance of the conspiracy.  A grant deed for the Hillcrest property was recorded on November 27, 2001.

*The Nine Property DOT*

On September 23, 2002, Frey, as trustee of the Frey Trust, recorded a deed of trust in favor of the Frey Trust as beneficiary.  The deed of trust, purportedly securing repayment for a $1.25 million loan and executed by Kubrak on behalf of American Realty, transferred security interests in nine parcels of property in Southern California controlled by Josh.[7]

Moshe Schnapp testified at trial.  Schnapp was Josh's former business partner who, prior to a settlement agreement in November 2002, was involved in litigation with Josh, Kubrak and various entities (the Schnapp litigation).  Schnapp testified that Josh conducted business in such a way that his name would not appear as the owner of any property, and vested properties in the names of different business entities, including some entities in Kubrak's name, in order to hide assets from Patti.  The settlement agreement in the Schnapp litigation provides that:  "'Kubrak is an individual doing business in the name of a number of individuals as well as entities [collectively defined as the Kubrak Parties] . . . includ[ing] . . . American Realty of California . . . ,'" and that the Kubrak

---

[7] The properties were:  (1) the Hillcrest property; (2) 13225 Gault Street, North Hollywood (Gault property); (3) 18607 Ventura Blvd., Los Angeles (Ventura property); (4) 455 South La Peer, Beverly Hills; (5) 10336 Wilshire Blvd., No. 403, Los Angeles; (6) 10336 Wilshire Blvd., No. 601, Los Angeles; (7) 5215 Colfax, Los Angeles; (8) 251 S. Loma, Los Angeles; and (9) 10520 Wilshire Blvd., No. 202, Los Angeles.

Parties would thereafter retain American Realty and American Realty of California, Inc., a Nevada Corporation. Prior to settlement of the Schnapp litigation, Josh and Schnapp owned American Realty.

In all his real estate transactions with Josh and Kubrak, Frey received his instructions only from Josh, never from Kubrak. Frey testified that he made one or more loans—a total of $1.25 million—to Josh and Kubrak in exchange for the security interest of the Nine Property DOT.

The trial court found that neither Frey nor the Frey Trust gave anything of value for the Nine Property DOT. The court also found that Frey had not acted in good faith in connection with his receipt of the Nine Property DOT and that, when he agreed to accept the DOT, he knew Josh was hiding assets from Patti. The court found that when Josh (who was insolvent) gave the Nine Property DOT to Frey, he did so with an intent to hinder, delay and defraud his creditors, including Patti. When Frey agreed to accept the Nine Property DOT, he participated in a conspiracy with Josh and Kubrak to defraud Josh's creditors.

The trial court found that Patti satisfied her burden to establish a fraudulent conveyance for a value of $1.25 million from Josh to the Frey Trust, using American Realty as an instrumentality. The court also found Frey commingled funds between his own accounts and those of the Frey Trust such that the Frey Trust was, "in essence, an extension or continuation (if not the alter ego) of Frey, and Frey and the Frey Trust should be held jointly liable for any fraudulent transfers. Even if Frey and the Frey Trust had maintained their separate identities, nevertheless, Frey, as an aider and abettor, should be held liable equally with the Frey Trust for the fraudulent activities of the Frey Trust, including the transfer of the $1.25 million Nine Prop[erty] DOT." Prejudgment interest was awarded at a rate of 10 percent per annum on $1.25 million from September 23, 2002 to the date of judgment.

7

*The Tikva DOT*

Tikva, LLC (Tikva) was formed by Frey, Cy Yehros and Yakov Hefetz.[8]  Frey testified that Tikva was formed to develop a project that never materialized.  The entity was never capitalized with any large sums of money.  In addition to organizing Tikva, Frey was its agent and managing member/owner.

On August 26, 2003, Nellis Motel Company, Inc., a Nevada Corporation (Nellis), as trustor, executed a deed of trust in favor of Tikva, as beneficiary, to secure payment of a $2 million loan (the Tikva DOT).  Kubrak executed the deed of trust on behalf of Nellis.  The Tikva DOT was recorded on October 13, 2003.

Frey testified that Yehros "was the owner of the Nellis Lodge and he sold it to Josh . . . .  [¶]  And, at some point, Josh or [Kubrak] or the organization, the Josh organization, there was a question of them owing [Yehros] [$]2 million or pledging some $2 million in the future sometime and they created a document."  Frey testified that it had "nothing to do with [him] or with [Hefetz].  Tikva was never capitalized with any large sums of money.  We were planning a project that never materialized and the fellow that sold Nellis Lodge to [Josh] somehow, there was $2 million pending and he asked if it would be put into Tikva.  That is all."  Asked if Tikva ever "loan[ed] $2 million to Nellis," Frey responded, "To my knowledge, no, I don't think Tikva ever had $2 million."  But Frey said he "must have been aware of [the Tikva DOT] at the time . . . ."

The court found that neither Frey nor Tikva gave anything of value to Josh in exchange for the Tikva DOT.  It also found that, at the time Frey agreed on Tikva's behalf to accept that DOT, he knew Josh (then insolvent) was hiding his assets from Patti, and did so as a participant with Josh and Kubrak in a conspiracy to defraud Josh's creditors.  Frey did not act in good faith in connection with his receipt of the Tikva DOT.

The court found that Patti was injured as a result of the $2 million fraudulent conveyance from Josh to Tikva, and awarded prejudgment interest at a rate of 10 percent per annum from August 23, 2003 to the date of judgment.  The court also found that

---

[8] The reporter's transcript spells Yehros, "Sy Yaros" and Hefetz, "Hefitz."

Tikva was Frey's alter ego and that Frey was liable for the entity's fraudulent activities. Alternatively, to the extent Tikva had maintained a separate identity, Frey, as an aider and abettor, was jointly liable with Tikva for the fraudulent transfer of the $2 million deed.

## DISCUSSION

*1.     Standard of review*

The bulk of Frey's appeal involves his assertion that there is not substantial evidence to support the trial court's factual findings.[9]  In such cases, we determine whether, "on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, [we are] without power to substitute [our] deductions for those of the trial court."  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.)  This is a difficult standard of review to meet, and an appellant "raising a claim of insufficiency of the evidence assumes a 'daunting burden.'"  (*Whiteley v. Philip Morris, Inc*. (2004) 117 Cal.App.4th 635, 678.)

Frey's challenge to the legal basis for the trial court's conclusion that he is liable on the fraudulent transfer involving Tikva as its alter ego or as an aider and abettor, is reviewed de novo.  (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1515 [whether facts found by trial court are legally sufficient to support judgment is a question of law subject to de novo review].)

---

[9] Patti asserts that Frey's substantial evidence claim is waived by virtue of the trial court's finding that Frey conspired with Josh to hide his assets.  She is mistaken.  A fraudulent transfer claim under UFTA may support a cause of action for civil conspiracy. (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 837 (*Filip*).)  Here, however, the trial court rejected Patti's posttrial effort to impose coconspirator liability on Frey.  Having chosen not to appeal this ruling, Patti has forfeited any assertion of error. (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [respondent who chooses not to file cross-appeal may not seek change in judgment].)

9

## 2.    *Damages award*

The principal thrust of Frey's appellate argument is that Patti failed to establish an entitlement to monetary relief due to a fraudulent transfer in violation of UFTA as a result of either the Nine Property or Tikva deeds of trust because she failed to demonstrate any specific injury.[10]

### a.    *Recovery under UFTA—legal standards*

There are two tests to determine whether a transfer is "fraudulent" under UFTA. Under the first, "actual fraud" test, a transfer is fraudulent if the debtor made the transfer (or incurred the obligation) with "actual intent to hinder, delay, or defraud any creditor of the debtor." (Civ. Code, § 3439.04, subd. (a)(1); see *In re Slatkin* (9th Cir. 2008) 525 F.3d 805, 814 [debtor's guilty plea and plea agreement that he operated Ponzi scheme with actual intent to defraud creditors conclusively established fraudulent intent under UFTA].) To determine actual intent, courts consider whether one or more of 11 "badges of fraud" is present. (See Civ. Code, § 3439.04, subd. (b)(1)–(11);[11] *Wyzard v. Goller* (1994) 23 Cal.App.4th 1183, 1191; *Filip*, *supra*, 129 Cal.App.4th at p. 834.) Although the presence of a single factor may only create a suspicious circumstance and may not constitute the requisite fraud, the presence of several considered together may afford a

---

[10] Frey does not challenge the judgment to the extent it awards Patti $100,000 for the fraudulent Hillcrest property transaction. He does take issue with the award of prejudgment interest on that portion of the judgment, which we address in section 3, *post*.

[11] These factors are: "(1) Whether the transfer or obligation was to an insider; [¶] (2) Whether the debtor retained possession or control of the property after the transfer; [¶] (3) Whether the transfer or obligation was disclosed or concealed; [¶] (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; [¶] (5) Whether the transfer was of substantially all of the debtor's assets; [¶] (6) Whether the debtor absconded; [¶] (7) Whether the debtor removed or concealed assets; [¶] (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ; [¶] (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation was incurred; [¶] (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; [and] [¶] (11) Whether the debtor transferred the essential assets of the business to a lienholder who then transferred the assets to an insider of the debtor." (Civ. Code, § 3439.04, subd. (b)(1)–(11).)

basis to infer fraud. (*In re XYZ Options, Inc.* (11th Cir. 1998) 154 F.3d 1262, 1271, fn. 17.) The creditor must establish fraudulent intent on the part of the debtor transferor by a preponderance of the evidence. (See *In re Stern* (9th Cir. 2003) 345 F.3d 1036, 1043; *Annod Corp. v. Hamilton &* Samuels (2002) 100 Cal.App.4th 1286, 1293.)

Under the second, "constructive fraud," test, a transfer is fraudulent if the debtor made the transfer (or incurred the obligation) without receiving "reasonably equivalent value" in exchange for the transfer or obligation and the debtor: (1) "Was engaged or about to engage in a business or transaction for which [his] remaining assets . . . were unreasonably small in relation to the business or transaction" (Civ. Code, § 3439.04, subd. (a)(2)(A)); (2) "Intended to incur or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to [repay]" (Civ. Code, § 3439.04, subd. (a)(2)(B)); or (3) Was insolvent at the time, or was rendered insolvent by the transfer or obligation (Civ. Code, § 3439.05).

To recover under UFTA, a creditor must show she was injured by the fraudulent transfer. "A well-established principle of the law of fraudulent transfers is, 'A transfer in fraud of creditors may be attacked only by one who is injured thereby. Mere intent to delay or defraud is not sufficient; injury to the creditor must be shown affirmatively. In other words, prejudice to the plaintiff is essential. It cannot be said that a creditor has been injured unless the transfer puts beyond [her] reach property [she] otherwise would be able to subject to the payment of [her] debt.'" (*Mehrtash v. Mehrtash* (2001) 93 Cal.App.4th 75, 80 (*Mehrtash*); *Fidelity National Title Ins. Co. v. Schroeder* (2009) 179 Cal.App.4th 834, 841, 844 [same] (*Schroeder*).)

UFTA permits a monetary judgment against the transferee of a fraudulent conveyance to the extent of value transferred at the time of the transfer, subject to "adjustment as the equities may require." (Civ. Code, § 3439.08, subd. (c).) A transfer is not voidable under section 3439.04 "against a person who took in good faith and for a reasonably equivalent value . . . ." (Civ. Code, § 3439.08, subd. (a).) Further, "Notwithstanding voidability of a transfer . . . under this chapter, a good faith transferee . . . is entitled, to the extent of the value given the debtor for the transfer . . .

11

to . . . [¶] . . . [¶] A reduction in the amount of the liability on the judgment." (Civ. Code, § 3439.08, subd. (d)(3).) While the plaintiff bears the burden to prove fraudulent transfer as to each transfer, plaintiff need not prove the debtor intended to defraud a specific creditor. Proof of intent to defraud any creditor is sufficient under the UFTA. (*In re Total Containment, Inc*. (Bankr. E.D.Pa. 2005) 335 B.R. 589, 614.)[12]

### b. Nine Property DOT

Citing *Mehrtash*, *supra*, 93 Cal.App.4th 75, Frey argues the trial court erred when it found in Patti's favor as she failed to establish that she was injured by Josh's otherwise concededly fraudulent transfer of the Nine Property DOT to Frey in September 2002. *Mehrtash* is distinguishable.

In *Mehrtash*, *supra*, 93 Cal.App.4th 75 an ex-wife with a judgment for unpaid spousal support sought to have a quitclaim deed given by her former husband to his stepchildren set aside under UFTA. The wife's problem was that the property was so heavily encumbered it had no value as an asset. "Plaintiff produced no evidence that the value of the property could support any net recovery to her in the event the conveyance were set aside," nor did the wife claim on appeal that "she was injured financially by the allegedly fraudulent conveyance." (*Id.* at p. 81.) Absent such evidence, no relief was available under the UFTA. Injury to the creditor must be shown affirmatively, and prejudice is essential. No injury occurs unless the transfer puts beyond the creditor's reach property that would otherwise be available to subject to payment of her debt. (*Id.* at p. 80.) This rule was recently reaffirmed in *Schroeder*, *supra*, 179 Cal.App.4th at page 841.

To recover for the fraudulent conveyance of the Nine Property DOT, Patti had to show that property otherwise available to satisfy her debt was placed beyond her reach. Here, the court found that, using American Realty as an instrumentality, Josh conveyed

---

[12] UFTA actions often arise in the bankruptcy context. For that reason, and because California has adopted the Uniform Fraudulent Transfer Act, courts often call upon authority from jurisdictions, like Pennsylvania, which also have adopted the UFTA. (See 12 Pa. CSA §§ 5101–5110.)

the Nine Property DOT in the sum of $1.25 million to the Frey trust in September 2002. At the time of that transfer, Josh was involved in a dissolution proceeding and actively conducting business and vesting properties in such a manner so that his name would not appear as owner of any property in order to secrete assets from Patti. Josh was also insolvent at the time this transfer was made.

The court found that while the Michaelys' dissolution proceeding remained active, Josh and Kubrak formed a conspiracy to hide Josh's assets from Patti by way of fraudulent transfers of those assets to parties or entities Josh controlled. Frey joined that conspiracy in 2001 when he agreed to act as a strawman with regard to the Hillcrest property transaction. Frey continued to participate in the conspiracy in and after September 2002 when he accepted the Nine Property DOT on behalf of the Frey trust. Frey does not challenge any of these findings.

At trial, Frey testified a loan he made to Josh led to the Nine Property DOT: ""He [Josh] asked for a loan. I don't remember if I paid it in one sum or several sums but it was for a total of this amount, a million 250, and in exchange I got security of these properties.'" However, Frey could not remember what Josh had wanted the money for, on what terms, where or to whom Frey had delivered the funds, whether the loan was made to American Realty or whether he received a promissory note related to the Nine Property DOT. Frey conducted no title search on any of the properties, did not know how many liens were senior to his DOT on these properties or whether there was any equity. Frey admitted he "knew very little about these properties," did not "delve into them," and had willingly loaned $1.25 million to Josh "because he needed it[] [and he] trusted [Josh]."

The court did not find Frey credible. That conclusion finds support in the record. Frey was impeached with deposition testimony he gave in early October 2002, within two weeks of the recordation of the Nine Property DOT. Frey testified then that he had only ever had one business involvement with Josh, or any of his affiliates—a loan made fewer than six months before October 2002 secured solely by the Hillcrest property. Frey

13

claimed so far to have provided Josh $160,000 on that sole loan, which he "thought" was covered by a "written agreement" up to $250,000.

The court found no evidence Frey ever transferred "any funds of $1.25 million, or any other sum, . . . to [Josh][] or anyone affiliated with [Josh]." Indeed, neither Frey, nor the Frey trust gave anything of value in exchange for the $1.25 million Nine Property DOT. Further, "[w]hen Frey, as trustee of the Frey Trust, agreed to accept the security interests of the Nine Prop[erty] DOT, Frey knew that [Josh] was hiding his assets from [Patti] because of an ongoing divorce." The creation of the security interest is a "[t]ransfer" under the UFTA's statutory definitions. (§ 3439.01, subd. (i).)

The trial court found that Frey acted wrongfully, even if he did not act with a fraudulent intent. In closing, Frey's counsel argued Frey had merely acted as "an innocent, trusting person" in his transactions with Josh. The court readily dismissed this assertion, explaining: "the suggestion that Mr. Frey is totally innocent and is not aware that he is engaging in some nefarious conduct is not credible because he is engaging in conduct and knows there is a participation in secreting assets and apparently did not care, . . . so his conduct is not totally innocent. [¶] . . . [¶] . . . [Y]our claim that Mr. Frey is totally innocent and is totally naïve is not consistent with the testimony." Although there was no finding that Frey was actively involved in fraud or willful or malicious conduct, the court found him complicit in a scheme of events orchestrated by Josh to use this property to extract significant profits. Frey cannot be exonerated. Even if his conduct may be considered relatively minimal in comparison to Josh's, he knowingly allowed his name to be used under circumstances which prevented Patti from acquiring access to property to discharge a debt Josh owed her.

Frey was an instrumental part of a conspiracy scheme orchestrated to deprive Patti of access to assets from which she could satisfy the dissolution judgment. While he might not have had malicious intent, Frey's acquisition of the Nine Property DOT security interest was the product of a voidable, fraudulent transaction, leaving him no equitable right to deprive a good faith creditor access to the property or proceeds. The trial court did not err in requiring Frey to account for the value of the security interest he

14

received by a fraudulent conveyance. The record supports the court's conclusion that Josh's transfer of the Nine Property DOT to Frey satisfies the actual fraud test under UFTA, in that it was made with "actual intent to hinder, delay, or defraud" his creditors. At least five of 11 potential badges indicative of fraudulent intent are present here. Namely, Josh retained control of the properties secured by the Nine Property DOT after the transfer; Josh had been sued by Patti before the transfer was made or the obligation incurred; Josh concealed assets from Patti to prevent her from executing on the dissolution judgment; the value of consideration received by Josh was not reasonably equivalent to the value of the transferred asset; and Josh was insolvent at the time the transfer was made. (See Civ. Code, § 3439.04, subds. (b)(2), (4) & (7)–(9).)

The transfer of the security interest of the Nine Property DOT also satisfies UFTA's constructive fraud test. Josh, who was insolvent, made the transfer to Frey in a non-arms-length transaction without receiving "reasonably equivalent value." (Civ. Code, § 3439.05.) Frey's participation enabled Josh to place assets secured by the Nine Property DOT beyond the reach of his creditors, including Patti. Had Frey not agreed to hold title, there is no evidence the assets would have been unavailable to satisfy Patti's judgment. The trial court rejected Frey's assertions that Patti was not harmed by the recordation of the Nine Property DOT because she had not known of it at the time and did not show that, but for that DOT, she would have recovered funds from Josh.[13] In the fraudulent conveyance context, the focus is on transactions that deplete the debtor's estate in some way. (*Brandt v. nVidia Corp.* (*In re 3dfx Interactive, Inc.*) (Bankr. N.D.Cal. 2008) 389 B.R. 842, 883), making it "unavailable to other creditors." (*In re Crystal Medical Products, Inc.* (Bankr. N.D.Ill. 1999) 240 B.R. 290, 297.) The record supports the conclusion that Patti was injured by Frey's acquisition and subsequent

---

[13] We reject Frey's assertion that Patti was not injured because the liens were released by the time she became aware of them. Frey testified about release as to three of the nine properties covered by the Nine Property DOT, but acknowledged that he did not actually know if any release was recorded.

15

transfer of the security interest. Frey has not established the trial court erred in this regard.

In 2003, three of the nine encumbered properties were either sold or refinanced and the payoff Frey received totaled $1,608,000. Frey testified that he paid out this $1,608,000 as instructed by Josh, because the funds were in "excess of what was due [him]."

The trial court found that, as to each of the three transfers to Frey of sales and/or refinancing proceeds, "the evidence [was] unclear as to what portion of the proceeds was repayment of a purported loan and interest, and what portion was an excess payment." The court also found it was unclear as to who made the transfers, and whose property was transferred to Frey. And, to "the extent that Frey received funds from escrows to pay off purported liens on the Nine Property DOT, the release of liens on properties for which payment was made could constitute equivalent value." Accordingly, the court found Patti had failed to establish a fraudulent conveyance or injury with respect to proceeds from the sale or refinancing of the three properties at issue subject to the Nine Property DOT.[14]

The fact that Josh and Frey recovered proceeds of $1,608,000 from the sale or refinance of three of the nine properties, does demonstrate that the cross-collateralized properties did have at least $1.25 million in value in excess of any encumbrance besides the Nine Property DOT. This supports the court's conclusion that Patti was damaged in an amount equal to the face value of the Nine Property DOT. Under Civil Code section 3439.08, subdivision (b), a "creditor may recover judgment for the value of the asset transferred, as adjusted under subdivision (c) . . . ," which provides that "[i]f the judgment under subdivision (b) is based upon the value of the asset transferred, the judgment shall be for an amount equal to the value of the asset at the time of the transfer,

---

[14] Patti takes issue with this conclusion and the court's failure to "separately award damages based on these [$1,608,000] payments as it should have." Having chosen not to file a cross-appeal, Patti has forfeited this assertion. (*Estate of Powell*, *supra*, 83 Cal.App.4th at p. 1439.)

subject to adjustment as the equities require." Here, from a creditor's perspective, the "value of the asset transferred" was at least the face amount of the deed of trust.

Under the circumstances, the court found that equity required damages be fixed at the face amount of the instrument ($1.25 million), given Frey's willing and knowing assistance to help Josh hide the equity in the properties in the amounts of the deed of trust.

Frey's argument that Patti failed to show injury thus must be rejected, as well as his assertion that Josh's assets were not depleted because Frey gave the money back to Josh and released the liens. Under *Mehrtash*, *supra*, 93 CalApp.4th 75, a creditor is injured if "'the transfer puts beyond [her] reach property [she] otherwise would be able to subject to the payment of [her] debt.'" (*Id*. at p. 80.) The Nine Property DOT reduced the equity in the encumbered properties, thereby placing assets beyond Patti's reach.

    c.    *The Tikva DOT*

    (i)    *Background*

In 2003, Yehros purportedly sold the Nellis Lodge to Josh for $2 million. On behalf of Nellis, Kubrak executed a $2 million DOT in favor of Tikva. At the time Frey accepted the Tikva DOT, he knew Josh was hiding assets from Patti.

Frey testified that he and two others formed Tikva in order to develop a project. Frey was an organizer, agent, owner and managing member of Tikva. Because the project for which it was created never materialized, "'Tikva was never capitalized with any large sums of money.'" Frey did not believe Tikva ever had $2 million, or that it made a loan in that amount to Nellis.

The trial court found that Frey did not act in good faith in connection with his receipt of the $2 million DOT on behalf of Tikva, and that neither he nor Tikva gave Josh—who was insolvent at the time of the transfer—anything of value in exchange. At the time Frey accepted the Tikva DOT, he was participating in a conspiracy with Josh and Kubrak to defraud Josh's creditors.

The court found that Patti met her burden to demonstrate a fraudulent conveyance in the value of $2 million from Josh to Tikva, using Nellis as an instrumentality, and that

17

Patti was injured by her inability to recover the value of this $2 million fraudulent conveyance. The court also found "that Tikva was, in effect, an extension of Frey and, therefore, Frey should be held liable for the fraudulent activities of Tikva." Alternatively, to "the extent that Tikva maintained its separate identity, Frey, as an aider and abettor, should be held liable jointly with Tikva for the fraudulent transfer of the $2 million deed of trust."

Frey argues, as he did with respect to the Nine Property DOT, that Patti failed to show she was injured by the Tikva DOT. He also argues that the trial court erred in imposing judgment against him based on unpleaded alter ego and aiding and abetting theories. Assuming Patti was injured by the Tikva DOT, we agree the judgment cannot be upheld based on an alter ego or aiding and abetting theories.

*(ii)*     *The record does not support the conclusion that Frey is Tikva's alter ego*

The complaint does not assert that Patti seeks to impose liability on Frey for Tikva's activities, either on the basis of alter ego or aiding and abetting theories. Tikva was not named as a defendant. At trial, Frey objected when Patti began to question him about Tikva and the Tikva DOT. The court overruled the objection, permitting the questioning only to establish the relationship between Josh, Kubrak and Frey, and the latter's knowledge of the couple's activities. No alter ego claim was raised until after the close of evidence. At that point, Frey argued that his due process rights were jeopardized because the theory had not previously been raised or met, and requested that evidence be reopened to permit him to address that theory. The court denied his request.

By granting judgment in Patti's favor based on an unasserted theory, the court effectively amended the complaint to conform to proof at trial. Amendments to conform to proof, while favored, are not allowed if they raise new issues and deprive a party of the opportunity to defend on those issues. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 416 [summary judgment defendant has no obligation to negate an alter ego theory that was not adequately pleaded]; *Simmons v. Ware* (2013) 213 Cal.App.4th 1035,1050–1051 [improper for court to impose judgment

18

on theory of vicarious liability not alleged in complaint or litigated at trial].) Frey was unfairly surprised by a new claim asserted posttrial.

Even if Frey was on notice of the need to defend an alter ego theory,[15] there is insufficient evidence to sustain the trial court's finding that Tikva is an extension of Frey. "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of plaintiff's interests. [Citation.]" (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.) "'A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief . . . , but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice.' [Citations.]" (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 516.) The creditor bears the burden to plead and establish alter ego liability. (See *Minifie v. Rowley* (1921) 187 Cal. 481, 487–488.)

"Alter ego is an extreme remedy, sparingly used." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539 (*Sonora Diamond*); *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249 (*Las Palmas*).) "Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. [Citations.] A corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. [Citation.] Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the

---

[15] Patti argues that, in light of discovery in this action, her trial brief and the exhibits exchanged, Frey cannot legitimately claim to have been surprised by the aiding and abetting or alter ego theories.

equitable owners.  [Citations.]  The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds."  (*Sonora Diamond*, at p. 836; see also *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 842.)  Two conditions must exist before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.  (*Automotriz etc. De California v. Resnick* (1957) 47 Cal.2d 792, 796.)

There is no litmus test to determine when the corporate veil may be pierced.  Some relevant considerations include:  the commingling of funds and other assets; disregard of corporate formalities, and failure to maintain adequate corporate minutes or records the failure to segregate funds of the individual and the corporation; the unauthorized diversion of corporate funds to other than corporate purposes; the failure adequately to capitalize the corporation; the treatment by an individual of corporate assets as his own; the failure to obtain authority to issue stock or to subscribe to or issue stock under existing authorization; the representation by an individual that he is personally liable for corporate debts; the intermingling and confusion of individual and corporate records; sole ownership of all the stock by one individual or family; the domination or control of the corporation by the stockholders; the use of the same address for the individual and the corporation; use of the corporation as a shell for a single venture or as a conduit for an individual's business; the concealment or misrepresentation of the ownership, management or financial interests of the corporation; contracting with another with the intent to avoid performance by using corporate entity as a shield against personal liability, or by using corporation as a subterfuge for unlawful transaction; and formation and use of a corporation to transfer to it an existing liability of a person or entity.  (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811–812; *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1213 & fn. 3.)  No one factor is determinative; several must

exist before alter ego liability will be imposed.  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 539.)  The conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.  (*Zoran Corp.*, at pp. 811–812; *Sonora Diamond*, at p. 539.)  "Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence."  (*Las Palmas*, *supra*, 235 Cal.App.3d at p. 1248.)

Here, no adequate showing was made that Frey was the alter ego of Tikva.  Apart from possible undercapitalization, Patti identified none of the factors that would tend to demonstrate Frey is an alter ego for Tikva, especially those showing a unity of interest and ownership, such as commingling assets or disregard of corporate formalities.  To be sure, Frey presented no evidence that assets here were segregated or that corporate formalities were observed, but that was not his responsibility.

The only evidence offered regarding Tikva was that it was formed by Frey and two others, the project for which it was formed failed, for unexplained reasons, to materialize and that when the Nellis property was transferred, the transfer was between Yehros and Josh and Yehros asked Josh to put the DOT securing a purported loan in Tikva's name.[16]  Patti attempts to put the onus of proof on Frey, arguing it would be inequitable to uphold corporate formalities and prevent her from recovering against Josh by way of Frey's misdeeds.  But difficulty in collecting a debt is not grounds for granting alter ego relief.  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 539.)  It was not Frey's burden to show he was not an alter ego of Tikva; it was Patti's burden to show he was.

The court treated Frey as the alter ego of the corporation without articulating a legitimate basis to justify piercing the corporate veil.  Patti neither alleged alter ego nor

---

[16] The trial court noted that Frey had "testified that he treated Tikva as one of his pockets that he transferred money back and forth from."  The record, however, does not support this assertion.  Similarly, the court concluded that Yehros was not involved with Tikva.  Again, the record does not support this assertion.  Although the record contains scant evidence of anyone's involvement with Tikva, it does reflect that Yehros executed a grant deed in favor of Nellis on the same day Nellis executed a deed of trust for Tikva, purportedly at Yehros's request.

asserted it as a basis for equitable relief at trial. In objecting to the proposed theory when raised after trial and in the proposed statement of decision, Frey sought an explanation for imposing individual liability. The amended statement of decision does not address this point. There may be some evidence of inadequate capitalization, but none that demonstrates commingling of assets, disregard of corporate formalities or the other factors that would justify imposition of alter ego liability. Accordingly, the judgment imposing individual liability on Frey as to the fraudulent transfer involving the Tikva DOT on an alter ego theory must be reversed.

### (iii) No aiding and abetting liability

The trial court also found that to "the extent that Tikva maintained its separate identity, Frey, as an aider and abettor, should be held jointly liable with Tikva for the fraudulent transfer of the $2 million deed of trust." This conclusion too is legally unsupported.

Aiding and abetting liability may "'be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'" (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325–1326.) Fraudulent transfer is an intentional tort. (See *Filip*, *supra*, 129 Cal.App.4th at p. 837; *Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1643–1644 (*Monastra*).)[17]

Although money judgments are permitted under UFTA for the value of the asset transferred, adjusted as equity requires, California law does not permit the imposition of a money judgment against a party who was not a transferee under an aiding and abetting theory. The cases on which Patti relies addresses claims for civil conspiracy, not aiding

---

[17] As with the alter ego claim, Frey claims he was surprised by the aiding and abetting claim for the Tikva DOT. We assume, for purpose of discussion, that Frey had notice of this claim.

and abetting. (See *Filip*, supra, 129 Cal.App.4th 825; *Monastra*, *supra*, 43 Cal.App.4th at pp. 1644–1645; *Taylor v. S & M Lamp Co.* (1961) 190 Cal.App.2d 700, 705–706.) The two claims are distinct. (See *Neilson v. Union Bank of California, N.A.* (C.D.Cal. 2003) 290 F.Supp.2d 1101, 1134 [unlike conspirator, aider and abettor does not adopt tort of the primary violator as his own].) Here, Patti sought unsuccessfully to amend her complaint to add a conspiracy claim to impose fraud liability against Frey. In the absence of a claim of civil conspiracy, there is no basis to impose monetary liability under UFTA against Frey as an aider and abettor for a fraudulent deed of trust as to which he was not a transferee.

Patti's reliance on the unpublished district court decision *Hyosung (America), Inc. v. Hantle USA, Inc.* (N.D.Cal. Mar. 4, 2011, No. C-10-02160 SBA) 2011 WL 835781, to support her assertion that aiding and abetting is sufficient for the imposition of liability against a nontransferee on a fraudulent transfer claim is misplaced. In that case, which involved a transferee defendant, the court found the plaintiff had pleaded minimally sufficient facts to give rise to an inference that the defendant knew a transfer was fraudulent in order to survive a motion to dismiss. (*Id*. at p. *7.) *Hyosung* does not support imposing liability against Frey, a nontransferee third party, on a theory of aiding and abetting.

We agree with the reasoning in *Freeman v. First Union Nat. Bank* (Fla. 2004) 865 So.2d 1272, in which the Supreme Court of Florida addressed the precise issue before us: "'Under Florida law [Florida's UFTA (FUFTA)], is there a cause of action for aiding and abetting a fraudulent transfer when the alleged aider-abettor is not a transferee?'" (*Freeman*, at p. 1275.) The court held that FUFTA does not allow monetary damages against a nontransferee for aiding and abetting a fraudulent transfer. (*Freeman*, at p. 1277.)[18] *Freeman* rejected the position advocated here by Patti. After a thorough

---

[18] UFTA is construed as part of a uniform system of law. (Civ. Code, § 3439.11; see *Filip*, *supra*, 129 Cal.App.4th at p. 839 [Given Nevada's enactment of UFTA, and intent "'to further the substantive social policy of assuring that the efforts of judgment creditors and others to satisfy their claims will not be defeated by fraudulent transfers,'"

analysis of Florida's UFTA statutory scheme, identical to California's UFTA in pertinent provisions, the court concluded "[t]here is simply no language in FUFTA that suggests the creation of a distinct cause of action for aiding-abetting claims against non-transferees," and to adopt the position advocated "in this case [identical to that of Patti] would be to expand the FUFTA beyond its facial application and in a manner that is outside the purpose and plain language of the statute." (*Freeman*, at pp. 1276, 1277.)

### 3.    *Prejudgment interest*

The trial court awarded Patti $2,153,900.09 in prejudgment interest, pursuant to Civil Code section 3287, subdivision (a) (section 3287). Interest was awarded from 2002 to the date of judgment as to the Nine Property DOT, the only fraudulent transfer of concern for purpose of the issue of prejudgment interest.[19] Frey argues that section 3287 is inapplicable to the fraudulent transfer involving the Nine Property DOT because the damages Patti sought were neither certain nor capable of being made so.

Section 3287 states, in pertinent part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, . . . is entitled also to recover interest thereon . . . ." (§ 3287, subd. (a).) Where "the requirements of section 3287, subdivision (a) are met, an award of prejudgment interest is mandatory." (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co*. (2008) 169 Cal.App.4th 340, 347; *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th

---

court had "no doubt that Nevada would reach the same conclusion as California" and grant relief from fraudulent settlement agreement under UFTA]; *Cortez v. Vogt* (1997) 52 Cal.App.4th 917, 934, 937.) Florida has adopted UFTA. (See F.S.A. §§ 726.101–726.112 (FUFTA).)

[19] Our conclusion above renders it unnecessary to address the parties' arguments regarding the award of prejudgment interest on the portion of the judgment related to the Tikva DOT. Frey also concedes that prejudgment interest was appropriately awarded as to the $100,000 damages award for the Hillcrest property fraudulent transfer, although he maintains the award should be reduced to reflect the fact that it was not until June 2008 that he became aware Patti argued that her inability to collect from Josh was due in part to his participation in the Hillcrest property fraudulent transfer. As discussed below, we disagree.

824, 828–829; *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.) "The purpose of prejudgment interest is to compensate the prevailing party for the [lost use of funds] during the period before the judgment is entered." (*Tenzera, Inc. v. Osterman* (2012) 205 Cal.App.4th 16, 21.) The crucial factor under section 3287 is whether the damages were readily ascertainable. (*Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 798 (*Levy-Zentner Co.*).) "'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' [Citations.]" (*Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173.) The issue of whether an award of prejudgment interest under section 3287 is appropriate is a question of law we review de novo. (*Tenzera, Inc.*, at p. 21; *Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, *supra*, 169 Cal.App.4th at p. 347.)

Patti asserts that the certainty of damages should be viewed "from the standpoint of the creditor." Her failure to cite supporting authority for this assertion is not surprising, as this is not the law in California. "'"The test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount. [Citation.]"'" (*Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 774; *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907.) If the defendant does not know or cannot readily compute the damages, the plaintiff must supply him with a statement and supporting data so the defendant can ascertain the damages. (*Levy-Zentner Co.*, *supra*, 74 Cal.App.3d at p. 798.) "[W]here a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it." (*Id.* at p. 799.)

In her UFTA claim against Frey, Patti alleged that she had suffered total damages of at least $2 million. She did not claim to have been damaged only in an amount equal

to the value of the $1.25 million Nine Property DOT.  Moreover, Patti continues to take issue with the trial court's assessment of her damages as to that fraudulent transfer.[20] This ongoing discrepancy militates against a finding that an award of prejudgment interest was appropriate.  Damages are certain only if there is essentially no dispute regarding their computation.  (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, *supra*, 169 Cal.App.4th at p. 354.)

Patti's significant disagreement with the court's damages calculation defeats her claim for prejudgment interest.   Where there is a large discrepancy between the amount of damages demanded in the complaint and the size of an eventual award, that fact militates against the finding of certainty required by Civil Code section 3287.  (See *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.*, *supra*, 149 Cal.App.3d at p. 910.)  Here, Patti initially sought at least $2 million in compensation for fraudulent transfers as to which Frey was involved.  Frey disputed that claim.  The amount found due as to the Nine Property DOT after trial was $1.25 million.  A large discrepancy such as this is inconsistent with a sum certain or capable of being made certain at the time of the fraudulent transfer which formed the basis of this action.  The amount due Patti was not a sum certain within the meaning of Civil Code section 3287, subdivision (a).  (See *Marine Terminals Corp v. Paceco, Inc.* (1983) 145 Cal.App.3d 991, 995–996; *Williams v. Flinn & Treacy* (1923) 61 Cal.App. 352, 357 [damages uncertain when amount found by the court to be due to the plaintiff varied greatly from the amount which plaintiff asked for in complaint and had previously demanded from defendants].)

As to the $100,000 Hillcrest property fraudulent transfer, Frey concedes the propriety of an award of prejudgment interest, but argues it should not be calculated until June 2008, when he was served with the first amended complaint.  He asserts that Patti's claim was uncertain until he then became aware of it, or until it was reduced to judgment.

---

[20] Though we have not addressed these assertions due to her failure to file a cross-appeal, Patti continues to claim an entitlement to damages beyond those awarded by the trial court.  With regard to the Nine Property DOT she also claims she is owed at least $1.6 million more.

We disagree. Under UFTA, contingent creditors and tort claimants are fully protected against fraudulent transfers. A claim under UFTA is broadly construed and may be maintained even though contingent and not yet reduced to judgment. Under UFTA, a "'[c]laim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." (Civ. Code, § 3439.01, subd. (b).) The trial court's award of prejudgment interest as to this fraudulent transfer was proper.

## DISPOSITION

The judgment is reversed with respect to the award of damages and prejudgment interest related to the fraudulent transfer involving the $2 million Tikva deed of trust. The judgment is reversed with regard to the award of prejudgment interest as to the Nine Property deed of trust. The trial court shall enter a new judgment reflecting this opinion. In all other respects, the judgment is affirmed. The parties shall bear their own costs of appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


MILLER, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.